TERENCE T. EVANS, Circuit Judge.
 

 Herbert Carlson, a lawyer with his own office in downtown Chicago, reported adjusted gross income of $765,433 on his federal tax returns for 1990-92. His taxable income for the three years was reported to be $493,-424 with a tax due of $153,824. But Carlson didn’t pony up with even a red cent, so the IRS got on his tail, adding interest and penalties to his tax tab. Now, on this appeal from the district court (which affirmed a decision of the bankruptcy court), he warns us that there will be “a taxpayers’ revolt coming” if the IRS is allowed to run “roughshod” over people like him. Although that may be a bit melodramatic, we can only hope he’s wrong, for we conclude that he must lose his appeal.
 

 Carlson and his wife Margaret filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code in February of 1994. The IRS filed a proof of claim for the unpaid taxes plus penalties and interest. This appeal stems from the allowance, over the Carlsons’ objections, of the majority of the IRS’ Second Amended Proof of Claim.
 

 Margaret Carlson is not employed. But Herbert, as we noted, made a fair amount of money practicing law in downtown Chicago. And they lived in a home commensurate with Mr. Carlson’s income: a $1 million condominium on North Lake Shore Drive (ironically, for a tax case, the address is 1040) in Chicago. The property, subject to a $425,000 mortgage, is held in an Illinois land trust and titled in the name of the trustee. Due to the Carlsons’ continued failure to pay up, the IRS filed tax lien notices against the Lake Shore property on December 16, 1992, December 13, 1993, and February 9, 1994. On February 9, 1994, the IRS also seized the Carlsons’ residence,- although they continued to reside there because the property was never sold. A federal tax hen duplicating the February 9,1994, notice was filed by the IRS on April 29, 1994, but it was released 7 months later in November.
 

 Unbeknownst to the IRS, the Carlsons also owned a house in LaPorte County, Indiana, valued at $125,000. Two days after the IRS seized the Lake Shore Drive condo the Carlsons transferred title of the Indiana property to their son Peter for zero consideration; the warranty deed was recorded on February 15, 1994. A little more than a week later the Carlsons filed their bankruptcy petition. The IRS then filed its claim.
 

 Meanwhile, the Carlsons also failed to pay all of the social security and Medicare taxes (FICA taxes) and federal unemployment taxes (FUTA taxes) due in connection with people who worked at Mr. Carlson’s law office. In February 1995 the IRS notified Mr. Carlson that his 1993 and 1994 returns regarding FICA and FUTA taxes were selected for audit. In the bankruptcy court the IRS amended its proof of claim twice, adding unsecured priority claims stemming from unpaid FICA and FUTA taxes for 1992 and 1993 and unsecured general claims for related interest and penalties.
 

 According to Mr. Carlson, the sole reason he and his wife did not pay their 1990-1992 tax bills was the financial and mental strain caused by the medical condition of then-youngest son, who apparently is a manic depressive schizophrenic.
 

 The Carlsons eventually paid their tax bills for the 3 years in question. They refused, however, to pay the accrued interest and penalties and the FICA and FUTA assessments. On December 5, 1995, the bankruptcy court held that the IRS’ secured claim for interest and penalties was valid and that, with some exceptions relating to attorneys at Mr. Carlson’s firm, the FICA and FUTA tax claims were valid as well. On appeal by the Carlsons, the district court affirmed the bankruptcy court’s decision in all respects. The Carisons, with Mr. Carlson himself' at the wheel, appeal that decision. Having reviewed the bankruptcy court’s findings of fact for clear error and the conclusions of law, by the district court,
 
 de novo, In re Love,
 
 957 F.2d 1350, 1354 (7th Cir.1992); Fed. R. Bankr.P. 8013, we affirm.
 
 [1]
 

 
 *920
 
 Pursuant to 26 U.S.C. § 6601(a), the IRS assessed interest on the Carlsons’ unpaid tax liabilities. Section 6601(a) states
 

 [i]f any amount of tax imposed by this title ... is not paid on or before the last date prescribed for payment, interest on such amount ... shall be paid for the period from such last date to the date paid.
 

 The Carlsons argue that despite the mandatory language of § 6601(a) the bankruptcy court had the power, pursuant to 11 U.S.C. §§ 105(a) and 505(a)(1), to abate the interest. Section 105(a) gives the bankruptcy court the authority to issue any order necessary to carry out the provisions of the Bankruptcy Code, and § 505(a)(1) provides that
 

 the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.
 

 The Carlsons contend that the bankruptcy court committed an error of law when it held it had no equitable power to override the “addition to tax” imposed by § 6601(a).
 

 Unfortunately for the Carlsons, the bankruptcy court was correct. Section 505(a) gave the bankruptcy court the power to determine “the amount or legality” of the interest assessment. And the Carlsons never asserted that either § 6601(a) itself or its application to their situation was illegal; they only say it’s unfair. They also never argued that the IRS miscalculated the amount of interest due. Section 505(a)(1), therefore, has no application to a situation of this sort. In regard to § 105(a), although a bankruptcy court is a court of equity, it cannot use its equitable power to circumvent the law.
 
 See INS v. Pangilinan,
 
 486 U.S. 875, 883, 108 S.Ct. 2210, 2215-16, 100 L.Ed.2d 882 (1988) (“Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.”) (quoting
 
 Hedges v. Dixon
 
 County, 150 U.S. 182, 192, 14 S.Ct. 71, 74-75, 37 L.Ed. 1044 (1893)). Section 6601(a) states that when taxes are late, interest “shall be paid”; the Carlsons’ interest assessments were therefore mandatory and proper,
 
 accord Johnson v. United States,
 
 602 F.2d 734, 738-39 (6th Cir.1979), and the bankruptcy court would have been wrong to determine otherwise. Its equitable powers do not allow it to override the plain command of § 6601(a).
 
 Cf. Paul Revere Life Ins. Co. v. Brock,
 
 28 F.3d 551, 554 (6th Cir.1994).
 

 The Carlsons add that the bankruptcy court should have invoked the “discretionary exception” of 26 U.S.C. § 6404(e)(1), which allows the Secretary of the Treasury, at his discretion, to abate interest attributable to errors or delays of IRS officers or employees. According to the Carlsons, the IRS is to blame for their failure to pay taxes because its duplicate Hen, which took almost 7 months to release, prevented them from obtaining refinancing on their residence. Besides the fact that the Carlsons neither approached the IRS (as the Secretary’s delegate) seeking relief under § 6404(e)(1) nor presented this argument in the bankruptcy court nor showed how they were prejudiced by the April 29, 1994 filing (since it simply duplicated the prior lien), such an abatement by the Secretary is within his sole authority, and as such it is beyond the scope of judicial review.
 
 Argabright v. United States,
 
 35 F.3d 472, 476 (9th Cir.1994);
 
 Bax v. Commissioner,
 
 13 F.3d 54, 58 (2nd Cir.1993);
 
 Selman v. United States,
 
 941 F.2d 1060, 1064-65 (10th Cir.1991);
 
 Horton Homes, Inc. v. United States,
 
 936 F.2d 548, 554 (11th Cir.1991);
 
 see
 
 P.L. 104-168, Title III § 301(b), 110 Stat. 1457, codified at 26 U.S.C. § 6404(g) (requests for abatement made after July 30, 1996, are reviewable by the Tax Court).
 

 We move next to the penalties assessed against the Carlsons pursuant to 26 U.S.C. §§ 6651(a)(2) and 6654(a). The Carl-sons advance six theories in their attempt to invalidate the penalties. None of the six, however, are winners.
 

 
 *921
 
 The Carlsons’ most elaborate argument zeros in on a statutorily permitted excuse for not paying up. Penalties are assessed by the IRS when a taxpayer fails to pay income taxes on time “unless it is shown that such failure is due to reasonable cause and not due to willful neglect.” 26 U.S.C. § 6651(a)(2). Unless both reasonable cause and a lack of willful neglect are established, imposition of these penalties is mandatory.
 
 United States v. Boyle,
 
 469 U.S. 241, 245, 105 S.Ct. 687, 689-90, 83 L.Ed.2d 622 (1985). Here, it’s undisputed that “willful neglect” is not at issue.
 

 In regard to failure to pay estimates on time, penalties are assessed except “to the extent the Secretary determines that by reason of casualty, disaster, or, other unusual circumstances the imposition of such addition to tax would be against equity and good conscience.” 26 U.S.C. § 6654(e)(3)(A). Although a showing of “reasonable cause” is not often accepted as an excuse for a § 6654(a) penalty,
 
 see Lansdown v. Commissioner,
 
 73 F.3d 373 (table), 1995 WL 755262 at *4 (10th Cir.1995) (no reasonable cause exception to § 6654);
 
 Smith v. Commissioner,
 
 313 F.2d 724, 737 (8th Cir.1963) (same);
 
 United States v. Steck,
 
 295 F.2d 682, 685 (10th Cir.1961) (same);
 
 Sawyer v. United States,
 
 426 F.Supp. 572 (W.D.La.1977) (same), and we are highly doubtful it is, it would be, at the least, a minimum requirement,
 
 see, e.g., McIntyre v. Commissioner,
 
 272 F.2d 188, 189 (6th Cir.1959);
 
 United States v. Mathews,
 
 90-1 U.S.T.C. para. 50,-268, 1990 WL 74368 (W.D.Mo.1990);
 
 Roberts Metal Fabrication, Inc. v. United States (In re Roberts),
 
 147 B.R. 965 (Bankr.D.Kan.1992).
 

 “Reasonable cause” is not defined in the Internal Revenue Code. It is addressed, however, in the Treasury Regulations:
 

 [F]ailure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship ... if he paid on the due date.
 

 26 C.F.R. § 301.6651-l(c)(l). In considering whether a taxpayer exercised ordinary business care and prudence, a court should consider all facts and circumstances of the taxpayer’s situation, including the amount and nature of expenditures in light of income received prior to the date payment was due. A taxpayer exercises ordinary business care and prudence “if he ma[kes] reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due.”
 
 Id.
 
 “Undue hardship” means more than mere inconvenience. 26 C.F.R. § 1.6161-l(b). It must be substantial financial hardship, “for example, loss due to the sale of property at a sacrifice price.”
 
 Id.
 
 '
 

 Generally the taxpayer bears the burden of proof when disputing tax liabilities with the IRS.
 
 See Helvering v. Taylor,
 
 293 U.S. 507, 515, 55 S.Ct. 287, 290-91, 79 L.Ed. 623 (1935). In bankruptcy, however, the ultimate burden of proof lies on the claimant.
 
 In re Allegheny Int’l, Inc.,
 
 954 F.2d 167 (3rd Cir.1992);
 
 Fullmer v. United States (In re Fullmer),
 
 962 F.2d 1463 (10th Cir.1992). The courts of appeals are split on whether the IRS or the taxpayer has the ultimate burden of proof when a debtor objects in bankruptcy to the denial of deductions or abatements of their tax bills.
 
 Compare IRS v. Levy (In re Landbank Equity Corp.),
 
 973 F.2d 265, 269-71 (4th Cir.1992) (taxpayer retains burden),
 
 with Placid Oil Co. v. IRS (In re Placid Oil Co.),
 
 988 F.2d 554, 557 (5th Cir.1993) (IRS bears final burden)'. We agree with the bankruptcy court and the district court that we need not determine this circuit’s rule in this case because even if the IRS bore the burden of proof (which, at trial, the IRS thought it did), in the face of the IRS’ claim in bankruptcy the Carlsons nevertheless bore the burden of going forward, which required them to produce something sufficient to defeat the IRS’ prima facie case.
 
 See Placid Oil,
 
 988 F.2d at 557 (pursuant to 11 U.S.C. § 502 and Fed. R. Bankr.P. 3001(f), proof of claim is prima facie evidence of validity and amount; burden of going forward then shifts to objecting party, who must bring forth evidence equal in probative force; only then does burden revert to claimant to
 
 *922
 
 prove validity of claim by preponderance of the evidence);
 
 Allegheny,
 
 954 F.2d at 173-74 (same);
 
 Fullmer,
 
 962 F.2d at 1466 (same). According to the bankruptcy court, the Carl-sons failed at that task; they did not make a showing sufficient to rebut the penalty portion of the IRS’ claim. We find no error in that determination.
 

 The Carlsons provided no evidence that they exercised ordinary care and prudence in regard to their 1990, 1991, and 1992 income taxes. They presented no evidence that they attempted to conserve assets to meet their tax obligations. Paying taxes is one of only two sure things in life, yet the Carlsons allowed their tax liabilities to build over 3 years without taking significant steps to reduce or meet those liabilities. For instance, the Carlsons did not set aside funds out of Mr. Carlson’s draw from his firm, make periodic payments when they could, seek financing during those years, or sell their Indiana property, which would have satisfied a large chunk of the IRS’ bill. Mr. Carlson asserts that his son’s medical bills totaled $170,000 over the 3 years in question. This indeed is a huge sum, and it no doubt caused pain — financial and emotional-to the Carlsons, but during the same period Mr. Carlson’s taxable income as an attorney was just shy of a half a million dollars. So despite having about $320,000 in taxable income after medical expenses, the record shows no attempt to set aside even a buck for Uncle Sam. As Mr. Carlson said himself, “[I]t’s just money that I was using, I used for other purposes____” The Carlsons also contend that they sought financing but could not get any as a result of the tax liens. But the first hen popped up in December 1992, 20 months after the first tax deadline passed without payment. Moreover, little evidence showing they were denied credit is in the record. Mr. Carlson testified that borrowing money from a family member was an alternative, but he never even asked the relative for a loan. Mr. Carlson did ask a broker to look into refinancing, but that did not occur until early 1993; not much happened and the Carlsons did not follow up. They gave two persons powers of attorney to deal with the IRS, but again not much happened and the Carlsons did not follow up. The Carlsons erroneously believed that once they hired the broker and gave a power of attorney, their own responsibility for timely payment dissipated. But reliance on an agent does not constitute “reasonable cause” under § 6651(a).
 
 Boyle,
 
 469 U.S. at 252, 105 S.Ct. at 693. That the agents were expected to tend to the matter does not relieve the principals of their duty to comply with tax filing and payment dates.
 
 Id.
 
 at 250, 105 S.Ct. at 692. “Ordinary care and prudence” requires more than mere delegation.
 

 The Carlsons claim that the costs of their son’s medical care, together with the mental distress caused by his illness, constituted an undue hardship justifying their failure to pay income taxes and estimates. The authority they present supporting the consideration of illness as reasonable cause comes from Internal Revenue Manual (CCH) § 4562.2, which lists as a possible reason warranting relief “[d]elay ... caused by death or serious illness of the taxpayer or a death or serious illness in his/her immediate family.” Unlike treasury regulations, to which we give deference,
 
 Smoot v. United, States,
 
 892 F.2d 597, 601-02 (7th Cir.1989), the Internal Revenue Manual has no such luster. Noncompliance with the manual does not render an action of the IRS invalid.
 
 United States v. Horne,
 
 714 F.2d 206, 207 (1st Cir.1983). Procedures in the Internal Revenue Manual are intended to aid in the internal administration of the IRS; they do not confer rights on taxpayers.
 
 United States v. Mapp,
 
 561 F.2d 685, 690 (7th Cir.1977); Hor
 
 ne,
 
 714 F.2d at 207. We do agree with the Carlsons, though, that financial, mental, and emotional hardship caused by the serious illness of a family member might add up to reasonable cause.
 
 See, e.g., Boyle,
 
 469 U.S. at 253-255, 105 S.Ct. at 693-94 (Brennan, J., concurring) (taxpayer who shows he was unable to file due to physical or mental incapacity might be excused from penalty). We disagree with the Carlsons, however, about whether their particular situation met the reasonable cause standard.
 

 According to Mr. Carlson, his son was constantly on medication; was uninsured until 1993, and even now relies on the Carl-sons to pay the uncovered balance of his medical expenses; was treated by more than
 
 *923
 
 five psychiatrists; lived with the Carlsons in the Lake Shore Drive condominium; is extremely annoying, irritating, and dangerous; physically attacked his mother and grandmother; was hospitalized twice; cannot be left alone; stole and pawned jewelry from family mémbers; and generally made the Carlsons’ lives “a ‘living nightmare.’ ” The Carlsons assert that their son’s condition “is the kind of disruptive illness that would qualify [as reasonable cause] under any fair application of the rule.” Although the situation, if it is really as dreadful as it sounds, is sad, we do not think it constitutes the type of hardship that excuses the payment of taxes. We believe the type of illness or debilitation that might create reasonable cause is one that because of severity or timing makes it virtually impossible for the taxpayer to comply— things like emergency hospitalization or other incapacity occurring around tax time. The Carlsons presented no medical evidence establishing the nature of their son’s illness or its likely effect on those around him. But the best indication that the son’s illness did not create an undue mental or emotional hardship is how the Carlsons were able to exercise ordinary care and prudence in regard to many other matters despite their son’s illness — Mr. Carlson continued to run a profitable law firm, he hired an accountant to prepare and file his returns, he apparently did not default on the $425,000 mortgage, and he continued to pay all of his employees and, for at least a portion of the time, withhold taxes from their wages. Although Mr. Carlson testified “I wasn’t thinking about my taxes. I mean, I was having so much problems, everything just slipped in 1990, ’91, and ’92 because it was a situation that was totally all consumingf,]” the actual facts show that his son’s illness really was not all-consuming.
 
 See, e.g., Roberts,
 
 147 B.R. at 968 (illness must be “of such a degree as to render the taxpayer physically or mentally incapable of preparing a return or conducting any business activity, and the taxpayer must not even conduct other business”);
 
 Akins v. Commissioner,
 
 T.C.M.1993-256, 65 T.C.M. (CCH) 2937, 2939, 1993 WL 195425 (1993) (“The fact that [the taxpayer] arranged to have his accountant prepare income tax returns for the years in question indicates to us that his physical and emotional problems did not prevent him from exercising ordinary business care and prudence.”),
 
 aff'd,
 
 35 F.3d 577 (11th Cir.1994) (table). In regard to financial hardship, the Carlsons presented no evidence that their son’s medical bills caused catastrophic financial distress — no documentation was presented of cash flow problems, necessary living expenses, or problems with other creditors. They appear, actually, to have paid all their other household and business bills (the only creditors listed on their bankruptcy petition were the IRS, the Illinois Department of Revenue, and the mortgagee, and when asked at trial if he paid household expenses during the years in question, Mr. Carlson responded “Sure, sure, of course.”). During all this time the Carlsons continued to live in their expensive condominium (in which they had $575,000 in equity) and fully owned a second house valued at $125,000, the sale of which would have made a big dent in their debt to the IRS. Even on their voluntary petition for bankruptcy, the Carlsons listed income
 
 per month
 
 of $15,000 more than monthly expenses. The bankruptcy court found the Carlsons possessed the resources to pay their income tax liabilities, a finding of fact we do not think erroneous at all, let alone clearly so. The Carlsons’ situation doesn’t excuse their failure to pay the piper.
 

 The remainder of the Carlsons’ reasons for annulling the penalties have even less merit. They claim the bankruptcy court should have invalidated the penalties because the IRS violated the automatic stay after commencement of their bankruptcy proceeding. Section 362(a) of the Bankruptcy Code imposes a stay on “any act to create, perfect, or enforce any lien against property of the estate.” 11 U.S.C. § 362(a)(4). Its intended effect is to preserve the status quo as of the date of the bankruptcy proceeding. The Carlsons claim that the IRS violated the automatic stay by filing the tax lien notice of April 29, 1994. It is undisputed, however, that the April 29 notice only duplicated and involved only those claims secured by the notice filed on February 9, 1994. The Carl-sons — without authority because there is none — state that all prior liens were either superseded by or merged into the last lien filed, thus the April 29,1994, lien violated the stay (and the November 9, 1994, release ex
 
 *924
 
 punged all liens!). The duplicative April 29 lien notice, though, “create[d], perfect[ed], or enforce[d]” nothing; it could not establish any new rights beyond those already acquired by the February 9 filing, therefore it did not violate the stay at all. Besides, the punishment for violating the automatic stay is payment of damages, costs, and fees, not abatement of previously assessed penalties. 11 U.S.C. § 362(h).
 

 The Carlsons also argue that the stay was violated when the IRS thrice requested information in connection with audits of the 1993 and 1994 employment tax returns. They fail, though, to show how these supposed stay violations, which occurred in February and March 1995 and concerned
 
 employment
 
 taxes, caused their failure to pay
 
 income
 
 taxes by April 15,1991,1992, and 1993. Section 6651(a)(2) states in pertinent part: “In case of failure ... to pay the amount shown as tax on any return ... on or before the date prescribed for payment of such tax ... there shall be added to the amount shown as tax on such return [a penalty].... ” Those penalties therefore arose on the day after the taxes were due, not years later when any stay violation occurred. Although the penalty of § 6654(a) for underpayment of estimated taxes does vary with the length of time the underpayment continues, the Carlsons have never argued that the penalties assessed them should be prorated before and after the supposed stay violations caused by the audit requests, but rather that the audit requests obliterated their responsibility for penalties as a punishment for the IRS’ intentional misconduct. That would be a rather absurd result, like awarding a defensive team a touchdown because the offensive team jumped off-side. And in any event, the creation of an automatic stay prohibits the IRS from formally assessing tax liability, attempting to collect, or, again, “creating], perfect[ing], or enforcing]” a lien, 11 U.S.C. § 362(a)(4) and (a)(6), but not from actions like issuing notices of tax deficiency, 11 U.S.C. § 362(b)(9), or making audit inquiries to determine the amount of such a deficiency,
 
 H & H Beverage Distributors v. Department of Revenue,
 
 850 F.2d 165, 167 (3rd Cir.1988). The IRS, like any other creditor, is entitled to determine whether it possesses a valid claim against a debtor.
 
 Id.
 
 The audit requests in this case were mere inquiries about deficiencies rather than actions in the nature of assessments, and thus they did not violate the stay.
 
 [2]
 

 Next, the Carlsons assert that then-penalties should be voided because the trustee title holder and mortgagee were not properly notified, pursuant to 26 U.S.C. § 6335, of the seizure of their Lake Shore condo. Section 6335(a) requires written notice to the owner of property as soon as practicable after its seizure. Failure to give notice may cause a subsequent forced sale to be invalid, but no sale occurred here, and whether the IRS could have enforced any sale against the unnotified trustee and mortgagee has no bearing on the Carlsons’ liability for penalties. Notices of liens or of seizure and sale are elements of the collection procedure rather than a determinant of a taxpayer’s liability for penalties. The Carlsons’ responsibility for penalties was not quashed by any later omissions by the IRS.
 

 The Carlsons next claim that the IRS could not put a lien on or seize for nonpayment of their personal income taxes real property to which they did not possess title. They think that because the tax liens were filed, against them, rather than the title holder, the notices were void. The Carlsons are wrong. A federal tax lien attaches to “all property and rights to property, whether real or personal,” belonging to the taxpayer. 26 U.S.C. § 6321. Although a beneficial interest in an Illinois land trust is an interest in personal property (even though the beneficiary retains most of the attributes of real property ownership),
 
 People v. Chicago Title and Trust Co.,
 
 75 Ill.2d 479, 488, 27 Ill.Dec. 476, 389 N.E.2d 540 (1979), the liens did indeed attach to the personal property interest. In addition, in regard to an Illinois land trust, for tax purposes
 

 
 *925
 
 true ownership lies with the beneficiaries though title lies with the trustee.... Indeed, there is not a single attribute of ownership, except title, which does not .rest in the beneficiary....
 

 A common-sense definition of “owner” as used in a tax statute must encompass the beneficiary of a land trust, because that beneficiary controls the purchase, sale, rental, management and all other aspects of land ownership.
 

 Chicago Title,
 
 75 Ill.2d at 492-93, 27 Ill.Dec. 476, 389 N.E.2d 540. Thus the real “owners” of the Lake Shore Drive property — the Carl-sons — were notified of the liens.
 

 According to the Carlsons, the IRS failed to notify them of the impending seizure of their condo. This, claim the Carlsons, violated Internal Revenue Manual procedures, thus treating them differently from other taxpayers in violation of their rights to due process and equal protection. The record, however, shows that an IRS officer verbally informed the Carlsons’ representative that enforcement action would proceed until the tax liability was paid. Although the officer may not have said explicitly “we’re going to seize the property,” the Carlsons were on notice that the IRS was moving forward, and a quick look in Mr. Carlson’s law books, Title 26 of the United States Code in particular, should have clued them in on what Would happen next. And they were, in fact, notified when the actual seizure occurred. Furthermore, as we have noted, noncompliance with the manual itself does not render an action of the IRS invalid, and the Carlsons have proffered no evidence of any deprivation of property (the residence'was never sold) or impermissible basis for discriminatory application of the manual to their situation. And again, IRS actions in February 1994 have little bearing on penalties the Carlsons first incurred in April 1990,1991, and 1992.
 

 In sum, the bankruptcy court did not err in allowing the IRS’ claim for penalties, and we anticipate no taxpayers’ revolt. The heart of this squabble is the Carlsons’ outrage at the IRS for not rolling over and accepting their payment plan rather than resorting to permissible statutory collection procedures. According to the Carlsons, “[a]t every turn, the IRS has failed to assist the Debtors as was its responsibility.” The IRS has ho -such responsibility, however, nor any duty to oblige the Carlsons with some payment scheme, let alone a payment plan suggested years after the taxes were due.
 
 [3]
 
 Prompt payment of taxes is imperative to the government, and fixed dates are essential to accomplish that result.
 
 Boyle,
 
 469 U.S. at 241, 105 S.Ct. at 687-88. Any understandable indignation in this case belongs to any taxpayer who scrapes together enough money or takes out a loan to meet the annual tax bill, rather than the Carlsons, who say
 

 Of course, Mr. Carlson ... would not pay exorbitant interest rates to a mortgage company when he felt he would receive reasonable and fair treatment from his own government (that it would abate interest and penalties because of the problems he faced).
 

 Mr. Carlson also failed to pay FICA and FUTA taxes for the secretaries and attorneys who worked for him in 1992 and 1993, claiming they were independent contractors. The bankruptcy court deemed the secretaries to be employees during those years and the attorneys to be employees through the quarter ending March 31,1993.
 

 The Carlsons’ sole argument regarding this determination is that they should not have been required to bring forth “indisputable proof’ that the workers were indepen
 
 *926
 
 dent contractors rather than employees, just some proof to shift the burden.” The burden of proof is immaterial at this point, though. The bankruptcy court heard testimony and found that the IRS ultimately proved the workers were employees — a factual finding which we review only for clear error. We find none; there was more than enough evidence to support the bankruptcy court’s decision.
 

 As a last gasp, the Carlsons want the FICA and FUTA taxes eradicated because the IRS’ claim regarding the secretaries’ employment during the second through fourth quarters of 1993 was an estimate. According to the Carlsons, unless the IRS could prove the exact amount due, that portion of the claim must be disallowed. They misstate the law. Title 11 U.S.C. § 502(c)(1) requires a creditor to estimate the amount of any disputed claim to prevent delay in closing the bankruptcy estate. The IRS based its estimate on data from prior returns pursuant to 26 U.S.C. § 6020(b)(1), which authorizes the Secretary of the Treasury to make a return from any available information he can obtain if a taxpayer fails to file. Any return so made is “prima facie good and sufficient for all legal purposes.” 26 U.S.C. § 6020(b)(2). The Carlsons provided no evidence such as accounting information or other business records indicating the IRS’ call was off the wall. As a result, the bankruptcy court properly wrapped up the matter on the information it had.
 

 The judgment of the district court is Affirmed.
 

 [1]
 

 . As a preliminary matter, the Carlsons currently have pending a motion to strike concerning a
 
 *920
 
 letter to this court filed by the Department of Justice on May 8, 1997. The majority of the letter is an explanation and apology by government counsel for including in her brief two misleading characterizations of testimony, but the Carlsons are correct that the letter also contains impermissible argument on whether the- record supports the district court’s decision. For that reason, we grant the motion and strike the letter.
 

 [2]
 

 .
 
 The Bankruptcy Code was amended, effective for cases filed after October 22, 1994, to explicitly allow such IRS audits. See 11 U.S.C. § 362(b)(9)(A); Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 704, .108 Stat. 4106 (1994). Our decision here implies that this amendment was a codification of prior law rather than a change in the law.
 

 [3]
 

 . Although Mr. Carlson disagrees with this characterization, the record shows he ignored the IRS when it came calling. A revenue officer personally visited Mr. Carlson at the Lake Shore Drive residence in December 1992. Mr. Carlson did not want to talk at that time. Instead, Mr. Carlson had his agent contact the IRS to ask for some time to get refinancing. In April 1993 the agent told the IRS he thought the Carlsons had made arrangements to pay the tax bill in full, yet no payment was forthcoming. The agent phoned the IRS in October 1993, stating that the Carl-sons were getting financing from a bank and would pay within 30 days, yet that period, too, expired without payment or further contact by the Carlsons. Mr. Carlson did not meet with a revenue officer again until after the February 1994 seizure. It's no surprise that by then the IRS was tired of the Carlsons’ stalling tactics and would not accept their suggested settlement plan.