In the

# United States Court of Appeals
### For the Seventh Circuit

No. 15-1545

ESTATE OF HAROLD STULLER, deceased, WILMA STULLER, and
L.S.A., INC.,

*Plaintiffs-Appellants,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois, Springfield Division.
Case No. 3:11-CV-3080-RM-TSH — **Richard Mills**, *Judge.*

ARGUED NOVEMBER 30, 2015 — DECIDED JANUARY 26, 2016

Before ROVNER and WILLIAMS, *Circuit Judges*, and SHAH,
*District Judge.*[*]

SHAH, *District Judge*. Wilma Stuller and her late husband,
Harold, bred Tennessee Walking Horses on their horse farm

[*] Of the Northern District of Illinois, sitting by designation.

in Tennessee.[1] They incorporated the horse-breeding opera-
tion as L.S.A., Inc., and claimed its substantial losses as de-
ductions on their tax returns. But the IRS determined that
the horse-breeding was not an activity engaged in for profit
and so assessed taxes and penalties against the Stullers. The
IRS also penalized the Stullers for failing to timely file their
2003 return. After paying up, the appellants, Wilma Stuller,
Harold's estate, and LSA, sued the government for a refund.
At a bench trial, the district court excluded the Stullers' pro-
posed expert, found that LSA was not run as a for-profit
business under 26 U.S.C. § 183, and determined that the
Stullers lacked reasonable cause for failing to timely file their
2003 tax return. The court also denied a request to amend
the judgment and effectively refund the taxes paid by the
Stullers on rental income received from LSA. We affirm.

---

[1] The Tennessee Walking Horse is a breed known for its unusual,
flashy gait and, according to the Tennessee Walking Horse Breeders' and
Exhibitors' Association, is the "world's greatest show, trail, and pleasure
horse." *See* http://twhbea.com/breed/history.php (visited Jan. 26, 2016).
The breed has also been the subject of controversy. In order to produce
the desired gait in the horse, some have resorted to cruel practices such
as soring—the use of chemicals or devices to cause pain whenever the
horse's feet touch the ground, making it pick its feet up quickly. The
Horse Protection Act of 1970, 15 U.S.C. §§ 1821–1831, prohibits soring,
and the U.S. Department of Agriculture enforces the act, which provides
both civil and criminal penalties. *E.g.*, *Derickson v. U.S. Dep't of Agric.*, 546
F.3d 335 (5th Cir. 2008); *United States v. McConnell, et al.*, No. 4:12-cr-
00009-HSM-WBC (E.D. Tenn.) (2012 prosecution involving sored Ten-
nessee Walking Horses and conspiracy to violate Horse Protection Act).
There are no allegations of soring at the Stullers' farm.

**I**

The Stullers lived in Springfield, Illinois, and owned several Steak 'n Shake franchises throughout central Illinois. They also bred horses. In 1985, they decided to move their horses to a warmer climate and bought a farm in Petersburg, Tennessee. At some point, the Stullers entered into an oral agreement with horse trainer Mack Motes to train their horses and manage the farm. Under this agreement, Motes received payments for training the horses, a 50% interest in horses born at the farm, prize money won by the horses, the right to breed his horses with their horses (for free), and the right to trade his horses with theirs. In 1992, the Stullers founded L.S.A., Inc., an S corporation, as a horse-breeding operation. LSA was owned entirely by the Stullers. A few years later, the Stullers started purchasing property in Eagleville, Tennessee, to relocate the horse farm to a larger property. By 1999, they had purchased a house and adjoining 332 acres for around $800,000. This property was owned by the Stullers individually or by each as trustees of a revocable trust, with each other as a beneficiary. The Stullers, however, lived at their home in Springfield, Illinois, where they cared for their granddaughter.

LSA was not profitable. From 1994 to 2009, it lost money every year except 1997, when its annual profit was $1,500. From 1999 to 2005, its annual losses ranged between around $130,000 to around $170,000 per year. During this time, LSA was only able to continue operating because it received around $1.5 million in loans from the Stullers, which were not repaid. For tax years 2003 to 2005, LSA reported losses totaling around $430,000 (about $130,000 to $150,000 per year). Because an S corp's losses pass through to its share-

holders, the Stullers claimed deductions for LSA's losses on their individual tax returns. The Stullers also reported income on their tax returns from LSA's annual rental payments of $80,000 for use of the Tennessee property.

Tragedy struck on January 6, 2003, when a fire broke out at the Stullers' Springfield home. Harold died, and the house was destroyed. Wilma Stuller and her granddaughter survived, although Stuller was hospitalized for double pneumonia. While waiting for her house to be rebuilt, Stuller lived at various rental properties. She also hired a personal assistant. Stuller managed to file a timely federal income tax return for the year 2002 for herself and her husband, but she did not file their 2003 joint return until February 2005.

Following an audit of the 2003 joint return and Stuller's 2004 and 2005 individual tax returns, the IRS determined that the horse-breeding was not an activity engaged in for profit under 26 U.S.C. § 183 and therefore the Stullers could not claim deductions for the S corp's losses. The IRS also imposed penalties for the late filing of the 2003 return. The Stullers paid the resulting assessments in full and filed suit in the district court for a refund.[2] The case proceeded to a bench trial.

Section 183 of the Internal Revenue Code permits tax deductions for losses from S corp activities engaged in for profit (i.e., business losses). 26 U.S.C. § 183. Treasury Regulation § 1.183–2(b) provides a non-exclusive list of relevant factors for determining whether an activity is engaged in for profit,

---

[2] Wilma Stuller married Motes (the horse trainer) in 2012 and took the name Stuller-Motes, but we refer to her as Stuller for simplicity. We also refer to the appellants collectively as the Stullers.

including: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer; (4) the expectation that assets may appreciate in value; (5) the taxpayer's success in other similar or dissimilar activities; (6) the taxpayer's history of income or losses; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; (9) elements of personal pleasure or recreation. No one factor is determinative; instead, all relevant facts and circumstances are to be taken into account. *Id*. In considering whether an operation was a business activity engaged in for profit, more weight is given to objective facts than a taxpayer's statement of intent. *Burger v. Commissioner*, 809 F.2d 355, 358 (7th Cir. 1987); *see* Treas. Reg. § 1.183–2(a).

Before trial, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the government moved to preclude Motes from testifying as an expert on whether the Stullers' horse-breeding was carried on with the intent to earn a profit. The district court allowed Motes to testify, reserving its ruling on the *Daubert* motion. After trial, the district court granted the motion. It determined that Motes's expertise did not extend to the financial or business aspects of a horse-breeding operation and he lacked a reliable methodology to opine on the Stullers' intent.[3]

---

[3] In the context of a bench trial, postponing the *Daubert* ruling until after trial was not error. "[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).

The district court held that LSA was not operated with a good faith intent to profit, and therefore its losses were not deductible as business expenses. The objective factors most significant to the district court were the unbusinesslike manner in which the Stullers operated LSA, the Stullers' history of steady losses with only one barely profitable year, and the substantial tax benefit LSA provided to the Stullers, given their income from other business ventures.

The district court also found that the Stullers did not establish reasonable cause for the untimely filing of the 2003 return.

## II

The Stullers argue that the district court's exclusion of Motes's expert testimony failed to follow the *Daubert* framework and ignored the record. Review of a district court's application of *Daubert* is de novo. If the court adhered to the *Daubert* framework, then its decision on admissibility is reviewed for abuse of discretion. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015).

The district court followed *Daubert*. It considered whether Motes was qualified in the relevant field (i.e., the business and financial aspects of horse-breeding) based on his education, training, or experience, per Federal Rule of Evidence 702. The court then examined whether Motes used a reliable methodology and analyzed the bases for his conclusions, the materials that Motes did or did not review, and whether Motes considered any factors outlined in Treasury Regulation § 1.183–2(b) or any other relevant factors. In making its determination, the district court did not ignore the Stullers' arguments and did not ignore evidence in the record. In-

deed, the court recognized that Motes was a horse trainer and that he was testifying based on his observations from day-to-day operations of the farm; the court simply disagreed that there was sufficient foundation for expert testimony.

The district court's determination that Motes lacked the requisite expertise and methodology was well-supported, and not an abuse of discretion. The issue for which Motes was offered as an expert was whether LSA's horse-breeding activity was run with the intent to profit. A witness may be qualified as an expert through "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Acknowledging that Motes had over fifty years of experience in training and breeding horses, the district court found that Motes's expertise did not extend to the financial and business aspects of running a horse-breeding operation. This was quite clearly correct. Motes testified that he did not breed horses to make money, it had been years since he sold a horse that he had bred, and his income was largely derived from training horses.

The district court also did not abuse its discretion in finding that Motes lacked a reliable methodology. The Stullers admit that Motes was unaware of and did not consider the nine, non-exhaustive factors relevant to determining whether an activity is engaged in for profit, as listed in § 1.183–2(b). He was also unfamiliar with LSA's finances and did not review any of its business or financial records. Instead, his method was to draw a conclusion based on his observations of the farm over the years and his oral agreement with the Stullers. Rule 702, however, requires an expert's testimony to have "a reliable basis in the knowledge and experience of

[the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592); *see Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). Given Motes's failure to consider the financial records of LSA and his unfamiliarity with the relevant factors outlined in § 1.183–2(b), the district court was well within its discretion to exclude Motes's testimony as unreliable.

Motes had no specialized experience or reliable method to draw upon when opining on the intent of the Stullers to turn a profit—he was at most a lay witness to the operations on the farm. The court considered some of his testimony in that proper context (for example, his testimony about the hard work required to breed and train horses), but correctly disregarded Motes's opinion about the Stullers' intent.

### III

The Stullers also challenge the district court's finding that LSA was not engaged in an activity for profit under 26 U.S.C. § 183. We review this finding for clear error, meaning we reverse only when "left with the definite and firm conviction that a mistake has been committed." *Burger*, 809 F.2d at 358 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

The district court here applied each factor of the regulations to the facts—so made no legal error—and drew inferences and conclusions that were grounded in the evidence. Its conclusion that only one factor, the expectation of asset appreciation, weighed in the Stullers' favor, while almost every other consideration pointed to the horse-breeding as a hobby or personal pleasure for the Stullers, was not implau-

sible, illogical, or internally inconsistent. *See Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013).

The evidence at trial showed that LSA kept minimal records for tax purposes (e.g., monthly bank statements), but did not retain records of expenses, horse training, or prizes won by horses. Although "a taxpayer need not maintain a sophisticated cost accounting system," the taxpayer must at least use a recordkeeping system "to monitor expenses or losses," in order for the taxpayer to make informed business decisions. *Burger*, 809 F.2d at 359. The recordkeeping for LSA did not adequately track expenses and other important information that would have allowed the Stullers to make informed business decisions.

Also, despite consistent and significant annual losses, LSA did not change its operating methods or adopt any new techniques that would significantly turn around its finances. In particular, the structure of the Stullers' agreement with Motes made it difficult from the outset for LSA to make a meaningful profit on any LSA-bred horse. Motes automatically received half the sale proceeds for any LSA-bred horse, in addition to the right to breed his horses with LSA's horses for free and to trade horses with LSA, even though LSA incurred all of the associated expenses with breeding and raising the horses. Motes also received substantial payments for training the horses, which were additional expenses incurred by LSA. Yet the Stullers never considered renegotiating their agreement with Motes. There is also no evidence that they attempted to find other sources of revenue for LSA, such as boarding horses or giving riding lessons. The Stullers argue that they took other means to control LSA's expenses, such as purchasing additional land for growing hay and digging

ponds, buying veterinary equipment to provide veterinary services in-house for the horses, and canceling insurance policies on the horses. But these changes did not address the root causes of LSA's unprofitability and, without more, were merely drops in the bucket. "[A] taxpayer must show that he or she has instituted some methods for controlling expenses, and if losses are mounting, methods to control those losses." *Burger*, 809 F.2d at 359. The Stullers failed to institute any realistic methods to control expenses or losses. This fact, along with the poor recordkeeping, showed that LSA was not run in a businesslike manner.

"Taxpayers should not only familiarize themselves with the undertaking, but should also consult or employ an expert, if needed, for advice on how to make the operation profitable." *Id*. The Stullers had substantial business experience operating Steak 'n Shake restaurant franchises, which were regulated and assisted to a large extent by the Steak 'n Shake corporate office. But horse-breeding was a very different kind of activity, and there was no evidence in the record that the Stullers consulted with any experts regarding methods for running a profitable horse-breeding enterprise.[4] Stuller argues that she and Harold received advice from their accountant and Motes. The accountant testified that while he provided advice related to the creation of LSA, prepared its tax returns, and generated annual reports of its

---

[4] Stuller also had an independent restaurant (one without franchisor supervision like the Steak 'n Shake restaurants). The failure of this restaurant, which closed within one year of opening at a loss of hundreds of thousands of dollars, weighs against finding that the Stullers engaged in similar, independently-run activities in the past and converted them from unprofitable to profitable enterprises. Treas. Reg. § 1.183–2(b)(5).

assets and liabilities, he was not capable of providing advice specific to the horse-breeding industry. Similarly, Motes testified that despite his years of experience breeding and training horses, he had no expertise in the financial or business aspects of horse-breeding. His horse-breeding activities were personal, not business-oriented. A taxpayer's failure to acquire expertise or consult relevant experts indicates lack of a profit motive. *See Burger*, 809 F.2d at 359.

The Stullers never came close to turning a meaningful profit through LSA; the best objective indicator that horse-breeding was a hobby, not a business, was their high tolerance for loss. *See id*. § 1.183–2(b)(6) and (7). LSA reported losses every year from 1994 to 2009, except for a $1,500 profit in 1997. By 2005, the Stullers had loaned LSA around $1.5 million, interest free, in order to keep the horse-breeding operation afloat, which also weighs against finding that LSA was operated with the intent to profit. Importantly, LSA's losses were relatively consistent (ranging from $130,000 to $190,000 per year during 1999 to 2005). As in *Burger*, LSA's steady losses continued beyond any arguable start-up phase of LSA and "beyond the point in which the petitioners could reasonably expect a profit." 809 F.2d at 361. The consistency of these losses from year to year also weighs against Stuller's argument that the losses during 2003 to 2005 resulted from independent events, like a downturn in the economy and adverse publicity affecting Tennessee Walking Horses.

During its years in operation, LSA's only profit occurred in 1997 and was only $1,500. This modest profit was the result of the fortuitous sale of a non-LSA bred horse for

$100,000.[5] The Stullers argue that a profit motive can be in-
ferred from the speculative nature of horse-breeding, sug-
gesting that a few similar sales could have turned LSA
around. "[A]n opportunity to earn a substantial ultimate
profit in a highly speculative venture is ordinarily sufficient
to indicate that the activity is engaged in for profit even
though losses or only occasional small profits are actually
generated." Treas. Reg. § 1.183–2(b)(7). But "[a]n occasional
small profit from an activity generating large losses, or from
an activity in which the taxpayer has made a large invest-
ment, would not generally be determinative that the activity
is engaged in for profit." *Id*. That is what we have here.
There was no evidence that LSA's operations were similar to
horse-breeding operations that generated substantial profits.
Under these circumstances, the Stullers' belief that one or
more of their horses might achieve great success is "at best a
'mere expectation' utterly lacking in 'any probative founda-
tion.'" *Filios v. Commissioner*, 224 F.3d 16, 23 (1st Cir. 2000)
(quoting *Hendricks v. Commissioner*, 32 F.3d 94, 100 (4th Cir.
1994)).

"Substantial income from sources other than the activity
(particularly if the losses from the activity generate substan-
tial tax benefits) may indicate that the activity is not engaged
in for profit especially if there are personal or recreational
elements involved." Treas. Reg. § 1.183–2(b)(8). The Stullers
received a substantial income from their other activities, in-
cluding the Steak 'n Shake franchises, rental properties, and
investment income. LSA's considerable losses—passed

---

[5] Notably, because the horse was not bred at LSA, the Stullers did
not have to share the sale proceeds with Motes.

through the S corp to the Stullers—generated substantial tax benefits for the Stullers over the years.

The Stullers also derived a great deal of pleasure from the horse-breeding operation, despite the hard work involved. Where an activity involves "substantial personal or recreational aspects," a significant expenditure of time and effort does not necessarily indicate an intention to derive a profit. Treas. Reg. § 1.183–2(b)(3).

Another factor not listed in § 1.183–2(b) but considered by the district court was the size of the horse farm. Stuller argued that having around thirty horses on a farm clearly showed that it was a business, not a hobby. But the court did not err in finding that the size of the horse farm was not dispositive in this particular case, especially considering the unbusinesslike manner in which LSA was run and its history of losses with barely any profit.

Finally, there was some evidence that the Tennessee farmland might appreciate. Treas. Reg. § 1.183–2(b)(4). But this expectation of appreciation (from an asset that did not belong to the S corp) did not offset the combination of other objective facts showing that LSA was not run with the intent to profit.

Considering, in particular, LSA's poor recordkeeping, the lack of business practices directed at making a profit, its substantial annual losses, and the significant tax benefits to the Stullers, there is no clear error in the district court's finding that the totality of facts and circumstances showed that LSA was not run as an activity with the intent to profit.

**IV**

Stuller also appeals the district court's finding that she lacked "reasonable cause" for the failure to timely file the 2003 income tax return. She disputes only the court's determination of whether the elements of reasonable cause were present. This is a question of fact reviewed for clear error. *Univ. of Chicago v. United States*, 547 F.3d 773, 785 (7th Cir. 2008).

Section 6651(a)(1) of the Internal Revenue Code imposes a penalty for failure to timely file "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." 26 U.S.C. § 6651(a)(1). A filing delay is due to "reasonable cause" when the taxpayer has made a satisfactory showing that she "exercised 'ordinary business care and prudence' but nevertheless was 'unable to file the return within the prescribed time.'" *United States v. Boyle*, 469 U.S. 241, 246 (1985) (quoting Treas. Reg. § 301.6651–1(c)(1)). Willful neglect means "a conscious, intentional failure or reckless indifference." *Id*. at 245.

Stuller argued that she was prevented from timely filing the joint 2003 return until February 2005, despite a six-month extension until October 2004, due to the difficult circumstances resulting from the fire. These circumstances included her husband's death, the destruction of their home, personal health problems and depression, employee embezzlement from the Steak 'n Shake businesses, and the fact that she was required to assume responsibility for obligations that were previously shared between her and her husband, including the care of their granddaughter. These were certainly tragic and difficult events for Stuller to endure, but Stuller did not show that she exercised ordinary business care and pru-

dence or that circumstances prevented timely filing. For example, during this timeframe, Stuller was able to timely file the joint 2002 return, to manage the Steak 'n Shake franchises, and to attend and compete in horse shows. She also had hired a personal assistant, who presumably helped Stuller to manage her affairs.

Stuller claims that, following her husband's death, missing trust and probate records prevented her from completing their joint tax return, but the trial testimony shows that the only outstanding documents her accountant needed to complete the tax return were bank statements. Even if these were in storage following the fire, duplicate copies could have been easily obtained from the bank.

Stuller's difficulties, while no doubt distressing, did not involve a combination of severity and timing that would have made it "virtually impossible" for her to comply with the filing requirements, *Matter of Carlson*, 126 F.3d 915, 923 (7th Cir. 1997), especially considering that Stuller had already sought and received an extension until October 2004. Stuller failed to satisfactorily show that she exercised "ordinary business care and prudence," and the district court did not clearly err in finding that she lacked reasonable cause for her untimely filing.

## V

After the district court determined that the Stullers did not engage in horse-breeding with intent to profit, and therefore that the Stullers could not deduct LSA's losses, they moved to amend the judgment, seeking a credit for the rental income reported from LSA. This request was denied. The district court's determination is a legal issue reviewed de no-

vo. *Mathin v. Kerry*, 782 F.3d 804, 805 (7th Cir. 2015) (questions of law from a bench trial are reviewed de novo); *see also Catalano v. Commissioner*, 240 F.3d 842 (9th Cir. 2001).

The point here is that LSA, an S corp, is a different entity than the Stullers, its shareholders. "[W]hile a taxpayer is free to organize [her] affairs as [she] chooses, nevertheless, once having done so, [she] must accept the tax consequences of her choice, whether contemplated or not, and may not enjoy the benefit of some other route [she] might have chosen to follow but did not." *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) (citations omitted). Denial of the Stullers' corporate-level deduction for LSA's losses did not change the fact that the Stullers annually received lease income from LSA, which was reported on their returns. Because denial of the corporate deduction does not change the "fundamental principle that an S corporation is a separate entity from its shareholders," the denial of a corporate-level deduction for an S corp's shareholder does not entitle the taxpayer to remove rental income from an individual tax return. *Catalano*, 240 F.3d at 843–44. Similarly, the Stullers cannot now "look through the forms they chose themselves in order to improve their tax treatment with the benefit of hindsight." *United States v. Fletcher*, 562 F.3d 839, 842 (7th Cir. 2009).[6]

---

[6] *Comdisco, Inc. v. United States*, cited by the Stullers, similarly states that "a taxpayer generally may not disavow the form of a deal." 756 F.2d 569, 577 (7th Cir. 1985) (citing *National Alfalfa*, 417 U.S. at 149). And unlike the taxpayer in *Comdisco*, the Stullers have not established that the economic reality of their chosen transaction with LSA was something different than what they had reported. Instead, the Stullers' argument looks more like a belated attempt to game the system in order to maximize their tax benefits.

The Stullers raise, for the first time on appeal, an argument for equitable recoupment. This argument has been waived. *Hess v. Bresney*, 784 F.3d 1154, 1161 (7th Cir. 2015). Even if it had not been waived, the Stullers would not be entitled to equitable recoupment because the doctrine is narrowly applied and "will lie only where the Government has taxed a single transaction, item, or taxable event under two inconsistent theories." *United States v. Dalm*, 494 U.S. 596, 605 n. 5 (1990). Because the lessee, LSA, is a separate entity from the lessors, the Stullers, there is no inconsistent legal theory here. *Catalano*, 240 F.3d at 844.

## VI

The judgment of the district court is AFFIRMED.