IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| PATRICIA L. FEOLA, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 160081N |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiff appeals Defendant's Notice of Deficiency Assessment dated February 11, 2016, for the 2010 tax year. A trial was held in the Oregon Tax Courtroom on May 2-3, 2017, and July 12-13, 2017, in Salem, Oregon. George A. Burgott appeared on behalf of Plaintiff. Kristen Ennis and James C. Wallace appeared on behalf of Defendant. The following witnesses testified at trial: Plaintiff; Kristi Elaine Hopp (Hopp), manager for trainer Greg Knowles (Knowles) of Arabian Expressions from 2008 through 2013, who now performs sales and marketing for the publication Arabian Horse World; Christopher Alan Petford (Petford), marketing, sales, and breeding manager for Midcrest Arabians; Amanda Ray Marchart (Marchart), an Oregon certified veterinary technician with a Bachelor of Science in Equine Studies; Mary Stewart (Stewart), Tax Auditor; and Lynden R. Mittleider (Mittleider), Plaintiff's CPA. The court admitted Plaintiff's Exhibits 1-4, 6-7, 9-11, 14-15, 17, 20-26, 28-34, 39-41, 44, and 51.[2] The court admitted

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered March 8, 2018. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] Defendant made some comments on several of those exhibits concerning the inclusion of duplicate receipts and invoices and the inclusion of documents evidencing expenses incurred outside of 2010. The court considers those comments in weighing the evidence.

Defendant's Exhibits B, D-D2, F, L-L2, W-X, CC-CC1, JJ-XX, KKK5, MMM-OOO, pages 1-3 and 37-42 of PP, pages 7-9 of QQQ, SSS-UUU.[3]

Plaintiff made several concessions before and after trial. For purposes of this matter, Plaintiff received additional 2010 income of $29,702 from the sale of the horse Gabriel.[4] (Ptf's Post-Trial Mem at 28; Def's Post-Trial Br at 21; Tr at 487, 843.)

Plaintiff conceded the following 2010 Schedule F expenses: car and truck expenses reduced to $0; gas expense reduced to $0; advertising expenses reduced to $0[5]; feed expenses reduced to $13,794; and repair and maintenance expenses reduced to $22,547. (Tr at 8-10, 231; Ptf's Post-Trial Mem at 24-26.)

Given the voluminous evidence presented in this matter, the Statement of Facts provides only a general overview of the relevant facts. Additional facts are set forth in the analysis.

## I. STATEMENT OF FACTS

Plaintiff was born and raised in Southern California, graduated from physical therapy school in 1978, and was first licensed as a physical therapist in California in 1979. (Tr at 153-155, 1283-1284.) Plaintiff married Craig Feola (Craig[6]) in 1979, moved to Oregon in 1980, and became licensed as a physical therapist in Oregon in 1980. (Tr at 153-155, 1283-1284.) Plaintiff's children were born in 1983, 1984, and 1988. (Tr at 156-157.)

---

[3] Defendant submitted two exhibits labeled SSS: the first is the 2010 recap of Plaintiff's "Calvert" account and the second is Mittleider's file "Emerald Valley PT." The court will refer to Middleider's file as "Exhibit SSS1."

[4] $27,000 was deposited into Plaintiff's Oregon Community Credit Union (OCCU) on May 3, 2010, and she reported $62,000 on her 2010 Schedule F rather than $64,701.50, which was the amount received. Plaintiff generated at least $96,702 in 2010 from her horse activities. (*See* Exs 1 at 14; 10; and MMM at 14.)

[5] $4,400 in advertising expenses allowed by Defendant on Plaintiff's 2010 Schedule F should have been allocated to Emerald Valley Physical Therapy. (Tr at 9-10.)

[6] Although it is customary to refer to parties by their last names, this Decision references two individuals with the same last name, Feola. The Decision refers to Craig Feola by his first name to avoid confusion.

A.    *Feola Farms: 1985 through 1995*

Petford met Plaintiff and Craig, then a fitness trainer, in late 1984 or early 1985.  (Tr at 93.)  Petford worked for a horse trainer, Jerry Sindt (Sindt), in Creswell, with whom Craig apprenticed, becoming a skilled trainer himself.  (Tr at 93-94, 156.)  In 1985, Plaintiff and Craig built an eight-stall barn with a tack room to condition horses for Sindt.  (Tr at 94-95, 156.)  Plaintiff testified that the barn was "an investment in this conditioning business that Craig was setting up as a satellite farm to [Sindt]."  (Tr at 160.)  Craig trained and showed the horses, while Plaintiff ran the "business part" of the operation, known as "Feola Farms."  (Tr at 96, 157-158.)  Petford testified that Plaintiff was "extremely good at client relationships, building new clientele and being part of the day-to-day operation."  (Tr at 96.)

In 1987 or 1988, Plaintiff and Craig purchased a stallion, National Fame, the son of a famous stallion.  (Tr at 97, 157-158.)  Petford described it as "a brilliant move" because they no longer had to spend money on breeding outside of their operation and Craig "had an in-house product to show, train, and sell."  (Tr at 97.)  They started breeding in 1990.  (Tr at 195.)  Feola Farms expanded its barn to 30 stalls to accommodate mares brought to breed to National Fame. (Tr at 157-158.)  By 1991, they had an indoor and outdoor arena, a groom rack, and a tack room. (Tr at 158-159.)  Feola Farms made money, but Plaintiff did not recall details.  (Tr at 481.)

Plaintiff described the activities she performed on behalf of Feola Farms.  She taught the horses to stop on the "whoa" command; shopped for feed, sawdust, and tack and managed deliveries of those items; managed feeding schedules; managed existing breeding clients and acquired new clients; completed all of the paperwork, including registrations and show entries; served on show committees; attended shows, set up decorations, and organized celebrations; managed hotel reservations and employee travel; performed all necessary research for the

business; and visited other farms, watched other trainers, made friends, and "got their hints for schooling," conditioning, and grooming. (Tr at 161-163, 169, 194-196.) Plaintiff is not a trainer, nor was she involved in training the horses. (Tr at 1286.) Training "is a very specific set of progressive activity" whereas "stop training" is like teaching a dog to sit; it is just "a standard thing * * * for [the] protection and management of a baby horse." (Tr at 1286-1287.)

Plaintiff and Craig divorced in 1995; Craig kept the stallion and Plaintiff took over the breeding business and retained the farm. (Tr at 97-98, 163-165.) Plaintiff was "left with a few mares" from which she "figured out [her] two [or] three best mares[,] kept the tease stallion[, * * *] kept the minis[,] and sold everything else over the next couple of years."[7] (Tr at 167.)

B.      *Bonfire Arabians: 1999 Through Present*[8]

Plaintiff chose to run a breeding business to capitalize on her asset of the 30-stall barn. (Tr at 171.) She chose not to have a breeding stallion[9] again due to the liability and extra work, relying instead on artificial insemination (AI), which was permitted by the breed association starting in the early 1990s. (Tr at 30-31, 75, 484.) The use of "shipped semen" expanded the availability of stallions, but, in Plaintiff's view, "destroyed the backyard breeder." (Tr at 31, 484.) She chose not to hire a trainer or offer boarding after attempting each in the mid-1990s.[10]

/ / /

/ / /

---

[7] Plaintiff testified that she uses the mini horses in her breeding activity; they teach the foals manners and keep them company during weaning. (Tr at 37-38, 215-216)

[8] Plaintiff presumably began her breeding activity as some point before 1999, but the records provided do not extend to years before 1999. (*See, e.g.,* Exs 5, 6, JJ-XX.)

[9] Plaintiff maintained a "tease stallion." (Tr at 167.) According to her inventory, that was National Alliance, although Petford testified that Plaintiff's mini horse Rocky was a tease stallion. (*See* Ex 6; Tr at 117.)

[10] Plaintiff did not hire a trainer of Arabian halter horses, but rather leased a dozen stalls to a trainer of miniature horses. (Tr at 1289.)

(Tr at 1289-1290.) The trainer "demanded that [Plaintiff's] arena be kept at a level that was not required by [her] breeding business" and damaged the stalls; the boarders did not pay their bills. (*Id.*)

Plaintiff breeds Arabian horses for the "halter" discipline, in which horses are judged on "confirmation," which is "the way the horse is put together" and "quality in the breed." (Tr at 61, 510.) Hopp compared halter shows to the Westminster dog show. (Tr at 61.) One would not use a halter horse for "performance disciplines," *i.e.*, riding. (Tr at 61, 549.) Petford estimated that Arabian halter horses constitute five percent of the world equine market. (Tr at 136-137.)

Plaintiff testified that at least 10 horse training farms left Oregon between 2000 and 2007, so she sent her horses to Knowles, of Arabian Expressions, in Scottsdale, Arizona, for training; she had a good relationship with Knowles from past competitions. (Tr at 171-172.) Hopp testified that Scottsdale is "the mecca of the Arabian horse industry"; it is a "marketing hub" where breeders from around the world bring their horses and home to the largest Arabian horse show in the world. (Tr at 21-23.) Plaintiff explained her training arrangement with Arabian Expressions:

> "[t]raining is when you send a prospective show horse to a professional barn where there is a trainer and conditioners and a sales office. And they are responsible for preparing the horse for show. They're responsible for marketing, tracking clients, showing the horse, obviously, taking care of the horse, improving the value of the horse, that kind of thing."

(Tr at 261; *see also* Tr at 57-58.) Sending a horse for training and showing is an effective way to market it; winning horse shows is the key to selling horses. (Tr at 24, 26.) However, there is never any guarantee that a given horse will sell. (Tr at 33-34.) Horse breeding is speculative by its nature; a pairing might produce a national champion once, but not the next time, or a pairing might produce multiple "marginal foals" before a champion. (Tr at 133-135.)

Plaintiff made an inventory of her horses from 1999 through 2014, summarized below:

| | # of horses | Breedings attempted | Foals born | Purchases | Sales (#) | Sales ($) | Gifts | Unknown dispositions |
|---|---|---|---|---|---|---|---|---|
| **1999** | 1 | | 1 | 1 | | | | |
| **2000** | 8 | 5 | 1 | | | | | |
| **2001** | 7 | 1 | 4 | | 2 | $5,500 | 1 | |
| **2002** | 10 | 6 | 2 | 1 | 2 | $7,000 | | |
| **2003** | 11 | 4 | 4 | 1 | | | | |
| **2004**[11] | 9 | 4 | 2 | 1 | 1 [2] | $2,000 [$52,000] | | |
| **2005** | 14 | 3 | 2 | 1 | 1 | $6,500 | | |
| **2006** | 15 | 5 | 0 | 2 | 1 | $1,000 | | |
| **2007** | 17 | 8 | 3 | 1 | 3 | $36,000 [$66,000][12] | | |
| **2008** | 23 | 12 | 6 | 6 | 3 | $37,000 | | 1 |
| **2009** | 20 | 1 | 7 | 1 | 8 | $157,500[13] | 4 | 1 |
| **2010** | 14 | 6 | 1 | 2 | 2 | $67,000 [$155,000][14] | 1 | |
| **2011** | 9 | 3 | 2 | | | | | |
| **2012** | 11 | 6 | 1 | 1 | 2 | $9,500 | | |
| **2013** | 16 | 6 | 2 | 4 | 4 | $56,000 | | |
| **2014** | 12 | 3 | 6 | | | | | |
| **Total** | | 73 | 44 | 22 | 29 [30] | $385,000 [$553,000] | 6 | 2 |

(Ex 6.[15]) Some of the horses in Plaintiff's possession were leased from other farms. Plaintiff's

inventory did not clearly distinguish between gross and net sales prices and missed some sales,

/ / /

---

[11] Plaintiff testified that she sold Absolute Magnum, foal of Lady Auria, for $50,000 in 2004, but failed to list that sale in her inventory. (Tr at 404-405, 556-557; Ex 6 at 5.) Although Absolute Magnum "was found to be sterile," he became a national champion after Plaintiff owned him. (Tr at 404; Ex 6 at 3-4.) On her 2004 Schedule F, Plaintiff reported $15,675 from sale of livestock produced and a farm loss of $30,703. (Ex SS at 11.)

[12] Plaintiff testified that she purchased Lady Auria for $20,000 and sold her for $50,000. (Tr at 404.) Her inventory lists the purchase for $20,000 in 1999 and a sale in 2007 for $20,000. (Ex 6 at 1, 8.) Petford testified that the offer on Lady Auria "was something that [Plaintiff] could not refuse." (Tr at 104.)

[13] Plaintiff's inventory states that she received only $40,000 out of $50,000 due for Mariani and only $6,400 out of $8,000 due for My Dream Tyme. (Ex 6 at 12-13.) $60,000 from the sale of Chocolate Lily and Squeezy for $87,500 was used to buy Sahara Illusion. (*Id.*)

[14] Plaintiff's sales totaled at least $155,000, gross, and she received at least $96,702, net, of that amount.

[15] Plaintiff also prepared a chart of her horse inventory from 1999 through 2015, which is illegible. (Ex 5) Plaintiff testified, based on that chart, that she successfully bred 22 horses, sold 22 horses, and gave away 9 horses, some of which had been given to her. (Tr at 187, 272-273, 431; Ex 5.) Of the sales, 14 were farm-raised and eight were re-sales. (Tr at 187.) It is unclear why Plaintiff's chart and inventory numbers differ.

noted above. Plaintiff testified that she always reported net income from horse sales and her CPA was aware of that. (Tr at 473, 477, 492, 498.)

Stewart recapped Plaintiff's Schedules F from 1999 through 2014, summarized below:

| | Gross Receipts | Feed | Veterinary | Shows | Training | Total Expenses | Net Loss |
|---|---|---|---|---|---|---|---|
| 1999 | $7,776 | | | | | $27,713 | $19,937 |
| 2000 | $20,204 | | | | | $28,956 | $8,752 |
| 2001 | $5,667 | | | | | $27,088 | $21,421 |
| 2002 | $9,177 | | | | | $43,039 | $33,862 |
| 2003 | $16,907 | $7,338 | $8,117 | $500 | $2,749 | $39,652 | $22,745 |
| 2004 | $17,855 | $8,298 | $14,738 | $1,200 | $1,721 | $48,558 | $30,703 |
| 2005 | $36,273 | $9,661 | $13,948 | $0 | $2,779 | $60,640 | $24,367 |
| 2006 | $1,000 | $8,339 | $22,530 | $0 | $13,845 | $78,371 | $77,371 |
| 2007 | $36,000 | $11,936 | $23,840 | $1,500 | $17,975 | $80,060 | $44,060 |
| 2008 | $36,000 | $22,606 | $49,897 | $22,367 | $42,331 | $188,987 | $152,987 |
| 2009 | $49,537 | $20,647 | $35,459 | $18,000 | $44,298 | $213,429 | $163,892 |
| 2010 | $67,000 | $17,243 | $31,739 | $0 | $37,294 | $166,925 | $99,925 |
| 2011 | $0 | $24,070 | $21,469 | $0 | $0 | $116,940 | $116,940 |
| 2012 | $9,733 | $21,731 | $26,472 | $0 | $18,376 | $113,861 | $104,128 |
| 2013 | $27,906 | $23,520 | $35,912 | $0 | $28,477 | $130,187 | $102,281 |
| Total | $341,035 | $175,389 | $284,121 | $43,567 | $209,845 | $1,364,406 | $1,023,371 |

(Tr at 436, 928; Ex X.)

C.    *Plaintiff's Other Businesses*

Plaintiff has continuously worked as a physical therapist since moving to Oregon in 1980. (Tr at 95-96.) She worked at home when her children were young then, in 1990, opened Emerald Valley Physical Therapy (EVPT) with a partner. (Tr at 153-154, 160.) They opened offices in Drain and Blue River in 1994, Creswell in 1995, and Bonita in 1997. (Tr at 163-164.) In 2007, they sold all of their offices except Blue River to Health South and Plaintiff became its employee. (Tr at 188.) Shortly thereafter, Plaintiff bought back the Drain office and eventually bought back the Creswell office. (Tr at 189-191.) In 2010, Plaintiff ran two physical therapy offices. (Tr at 432.) 2009 and 2010 were high earning years because her youngest child started school allowing her to put more hours into the business; she received income both from Health South and from her private practice; and she hired another physical therapist, "theoretically

doubl[ing] the income potential" of EVPT. (Tr at 190-191, 443.) Plaintiff testified that, had EVPT incurred losses like Bonfire Arabians, she would have "consolidated" and "let go of employees," but such changes are easier to make in a physical therapy business. (Tr at 465-466.)

Plaintiff opened a small store, Nooks and Grannies, that did not make a profit and she closed it after one year upon determining no better location was available. (Tr at 177-178, 466.)

D.    *Plaintiff's Recordkeeping and Tax Returns*

From 1982 through 2010, Plaintiff tracked her expenses in Ekonomik check registers, which were originally recommended by her CPA. (Tr at 198-200, 205, 492-493; Exs 14, CC.) Her tax returns were prepared based on the registers. (Tr at 498,763.) Plaintiff allocated expenses into categories including personal, farm, EVPT, and contracts. (Tr at 200; Ex 14.) The farm categories appeared to be subdivided into "hay, feed, sup;" "vet + farrier;" "office – registration, ads, subscr.;" "training, show fees;" and "mtnce + repairs." (Ex 14.) Plaintiff recorded few dates in her register and often only partial check number; some checks entered covered multiple expenses in different categories. (Tr at 279, 881-883, 887; *see also* Ex 14.) Plaintiff used credit card statements to allocate expenses in her register; she did not pay the entire bill each month, so she would "highlight the [expenses] that [she] attributed to wherever." (Tr at 284-285.)

Plaintiff ran four accounts out of her register, identified as "checkbooks" #1, #2, #3, and #4. (Tr at 398.) #1 is EVPT's account with US Bank; #2 is her personal account with US Bank; #3 is a personal account with Siuslaw Bank (now Banner Bank); and #4 is a personal savings account at OCCU.[16] (Tr at 398-402, 486, 764, 773-775, 784; Ex 14 at 38, 64, 66.) Plaintiff

---

[16] In addition to those four accounts, Plaintiff had a money market account, the "Calvert account," but she could not recall the institution it was with and did not produce any records pertaining to it. (Tr at 820-822, 846.)

preferred to pay horse expenses out of her personal account (#2), but sometimes paid them from the EVPT account (#1) due to lack of funds; the expenses were still categorized as farm-related in the register. (Tr at 394.) Prior to 2010, Plaintiff's CPA never recommended that she get a separate account for her horse activity. (Tr at 494.) In 2010, Plaintiff deposited some checks for EVPT into her personal account (#2) to avoid bank fees. (Tr at 838.) Plaintiff did not typically deposit money directly into her savings account (#4); she deposited money into one of the other accounts first. (Tr at 787.) Plaintiff testified that she made entries in her register within one month of signing a check and reconciled her register monthly, although she identified no evidence of reconciliations. (Tr at 201, 479.) She could not explain how she ran four checkbooks out of the same register contemporaneously, yet started and stopped different accounts on the same page.[17] (Tr at 498.)

Plaintiff provided some receipts and invoices from 2010, but testified that other records were sun damaged and unreadable, or perhaps lost. (Tr at 204, 814; Ex 51.) She provided some bank and credit card statements, but did not provide complete statements for EVPT. (Tr at 816-817; Ex MMM, NNN.) Banks only retain statements for seven years and Plaintiff did not ask until it was too late to receive EVPT's statements and cancelled checks for January through May 2010.[18] (*Id.*)

E.     *Defendant's Audit and Conference Adjustments*

Defendant opened an audit of Plaintiff's 2010 income tax return, specifically Schedule F, and Stewart held an interview with Plaintiff and her CPA on June 4, 2014. (Tr at 867; Exs L, L1,

---

[17] For example, "checkbook 2," representing Plaintiff's personal account, starts on the line immediately following the last line of "checkbook 1," representing EVPT. (Ex 14 at 38.)

[18] Evidently Plaintiff did not request the statements and cancelled checks until mid-2017, even though she received a subpoena in September 2016. (Ex PPP at 37-42.)

L2, F.) She denied Plaintiff's Schedule F farm loss under IRC section 183, reclassified $58,336 of her farm expenses under Schedule A, and imposed a 20 percent substantial understatement of income (SUI) penalty. (Ex D1 at 4.) A written objection meeting was held January 7, 2016. (Ex B.) Plaintiff's written objection was denied and Defendant issued a Notice of Assessment on April 26, 2016. (Exs 4, D.) Defendant's alternate position, should Plaintiff prove that she conducted Bonfire Arabians for profit, is that her Schedule F expenses should be reduced from $166,925 to $63,076. (Tr at 960-973; Ex 4 at 12-14.)

## II. ANALYSIS

The issues for the 2010 tax year are (1) whether Plaintiff's horse breeding activity was a business, for which deductions are allowed under IRC section 162, or an activity not engaged in for profit under IRC section 183; and (2) the amount of Plaintiff's allowable deductions for her horse breeding activity, whether allowed on Schedule A or F.[19]

As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence, which "means the greater weight of evidence, the more convincing evidence." ORS 305.427; *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).[20] "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [her] burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "In an appeal to the Oregon Tax Court from an assessment made under ORS 305.265, the tax court has jurisdiction to determine the correct amount of deficiency * * *." ORS 305.575.

/ / /

---

[19] In Plaintiff's Trial Memorandum, she requested waiver of the SUI penalty and interest levied against her. (Ptf's Trial Mem at 13.) No mention was made of the SUI penalty or interest in Plaintiff's Post-Trial Memorandum, perhaps because Plaintiff conceded unreported income. The court concludes the issue of the SUI penalty and interest is no longer before the court.

[20] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

A.      *Whether Plaintiff Engaged in Her Horse Breeding Activity for Profit*

"[T]he Oregon legislature intended to make Oregon personal income tax law identical to the Internal Revenue Code * * * subject only to modifications specified in Oregon law." *Herzog v. Dept. of Rev.*, 20 OTR 175, 177 (2010); *see also* ORS 316.007. "As a result, the legislature adopted by reference the federal definitions for deductions, including IRC section 162(a) related to trade or business expenses." *Morey v. Dept. of Rev.*, 18 OTR 76, 80 (2004).

A taxpayer may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." IRC § 162(a). However, if the activity "is not engaged in for profit," the taxpayer may deduct expenses incurred "only to the extent that the gross income derived from such activity for the taxable year exceeds the [allowable] deductions * * *." IRC § 183(a), (b)(2). "[D]eductions are not allowable under [IRC] section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for recreation." Treas Reg § 1.183-2(a). A horse breeding activity that produces a profit in two out of seven consecutive tax years is presumed to be engaged in for profit. IRC § 183(d). Plaintiff's horse breeding activity does not receive the benefit of that presumption because it did not produce a profit in any year.

An activity is "engaged in for profit if the taxpayer's 'predominant, primary or principal objective' in engaging in the activity was to realize an economic profit independent of tax savings." *McMillan v. Comm'r,* 105 TCM (CCH) 1263 (2013), 2013 WL 461640 at *4 (US Tax Ct) (quoting *Wolf v. Comm'r*, 4 F3d 709, 713 (9th Cir 1993)). "The expectation of a profit need not be reasonable, but the taxpayer must conduct the activity with the actual and honest objective of making a profit." *Dodds v. Comm'r*, 105 TCM (CCH) 1472 (2013), 2013 WL 968241 at *4 (US Tax Ct); *see also* Treas Reg § 1.183-2(a). "[G]reater weight is given to objective facts than to the taxpayer's mere statement of [her] intent." *Id.* The court does not use "a reasonable

person standard or substitute [its] own business judgment for what the [taxpayer] could have done better." *Metz v. Comm'r*, 109 TCM (CCH) 1248 (2015), 2015 WL 1285276 at *10 (US Tax Ct). The court focuses on "subjective intent." *Id.*

The Treasury Regulations set forth a list of nine factors to determine whether an activity is engaged in for profit. Treas Reg § 1.183-2. "No one factor is determinative" and

> "it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa."

*Id.* Courts may consider other factors if they explain "why the factors that 'should normally be taken into account' were insufficient." *Roberts v. Comm'r*, 820 F3d 247, 252 (7th Cir 2016). "Evidence from years after the year in issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in earlier years." *Dodds*, 2013 WL 968241 at *4.[21]

1.    *The manner in which Plaintiff carries on the activity*

"The fact that the taxpayer carries on the activity in a businesslike manner * * * may indicate that the activity is engaged in for profit." Treas Reg § 1.183-2(b)(1). This encompasses several sub-factors. *Giles v. Comm'r*, 91 TCM (CCH) 684 (2006), 2006 WL 237503 at *8 (US Tax Ct).

/ / /

/ / /

/ / /

---

[21] Plaintiff initially objected to post-2010 evidence, but subsequently acknowledged "it does appear that at least some courts have held that evidence from the years after the one at issue is relevant to the extent that it creates an inference regarding the taxpayer's requisite profit objective in earlier years." (Ptf's Post-Trial Mem at 22.)

a.  Maintaining complete and accurate books or records of trade or business

(1)  Business records, generally

"'The purpose of maintaining books and records is more than to memorialize for tax purposes the existence of the subject transactions; it is to facilitate a means of periodically determining profitability and analyzing expenses such that proper cost saving measures might be implemented in a timely and efficient manner.'" *Giles*, 2006 WL 237503 at *8 (quoting *Burger v. Comm'r*, 50 TCM (CCH) 1266 (1985)).  Taxpayers should use books and records to cut expenses, increase profits, and evaluate the overall performance of the operation. *Betts v. Comm'r*, 100 TCM (CCH) 67 (2010), 2010 WL 2990300 at *6 (US Tax Ct).  Maintenance of a "spreadsheet of the income and expenses" without any "business or profit plans, profit or loss statements, balance sheets, or financial break-even analyses" was insufficient under this factor. *Betts*, 2010 WL 2990300 at *6.[22]

Plaintiff recorded horse income and expenses in her ledger.  She did not maintain profit and loss statements, monthly income and expense reports, or similar types of financial records for her horse activity.  (Tr at 274-275.)  The court finds that Plaintiff's ledger is merely a record of her income and expenses and finds no evidence that Plaintiff used it to meaningfully analyze profitability.  This sub-factor weighs against Plaintiff.

(2)  Horse-by-horse tracking and analysis; horse-specific records

"In the case of a horse breeding activity, the maintenance of separate records for each animal's performance (*e.g.*, breeding results and offspring's performance) is an important factor

---

[22] By contrast, taxpayers who used QuickBooks; hired a CPA firm to perform monthly bank reconciliations, accounts payable, profit and loss statements, and payroll; hired a law firm to prepare written contracts for horse and semen sales; "kept good records of when they contacted each customer as well as relevant details of their discussions"; and prepared annual business plans conducted themselves in a businesslike manner. *Metz*, 2015 WL 1285276 at *10-11.

bearing on profit objective." *Bronson v. Comm'r*, 103 TCM (CCH) 1112 (2012), 2012 WL 129803 at *7 (US Tax Ct). However, tracking expenses on a "horse-by-horse basis" is not "a prerequisite to keeping accurate books and records * * *." *Metz*, 2015 WL 1285276 at *12; *see also Dennis v. Comm'r*, 100 TCM (CCH) 308 (2010), 2010 WL 3981730 at *8 (US Tax Ct) (finding a horse-by-horse tracking system was not necessary for adequate recordkeeping). "Maintenance of veterinary calendars and breeding data, by themselves, are consistent with a hobby and do not necessarily indicate a business purpose." *Price v. Comm'r*, 108 TCM (CCH) 616 (2014), 2014 WL 7156457 at *18 (US Tax Ct).

Marchart testified that she has seen "successful businesses" track expenses on a horse-by-horse basis and it is what she was taught in school. (Tr at 642.) Keeping individual files on each horse makes it easier to know what price one needs to achieve a profit on a sale. (Tr at 528-531.) Even though such recordkeeping is standard for businesses with clients (*e.g.,* boarding), it might not be necessary for a business with no clients. (Tr at 644.) Plaintiff agreed that, to calculate the value of an individual horse, one would start with the investment and expenses. (Tr at 421-422.) Ultimately, however, a horse is sold for the highest achievable price regardless of the investment. (Tr at 422-423.) Plaintiff did not track expenses per horse, although her veterinary, training, and farrier invoices were each per horse. (Tr at 207; Exs 21-25, 31.) Plaintiff received sale price recommendations from trainers and looked at her checkbooks to "evaluate horse by horse" when deciding whether to keep, sell, or give away a horse. (Tr at 209-210, 275, 422.) She testified that she had "a gut knowledge" of the profitability of individual horses. (Tr at 208.)

Equine professionals typically use and retain registration papers, which are like birth certificates for a horse or title to a car; veterinary records; boarding agreements; sales contracts;

and training and show contracts. (Tr at 44-47, 126-131, 150-151, 515, 522-528.) Hopp testified that small breeders generally do not keep records of attempted breedings, but larger breeders tracked foals, ovulation, and similar data. (Tr at 45-46.) Registration forms documenting sales or transfers must be sent to the breed association. (Tr at 128.) Marchart did not find Plaintiff's records to be consistent with the industry standard, noting the lack of registration papers, sales contracts, boarding contracts, training contracts, show contracts, ovulation reports, and records of stud fees other than some evidence of shipped semen and veterinary bills. (Tr at 531-533.)

Plaintiff did not typically retain sales agreements after the sale. (Tr at 274.) She testified that she "had breeding charts every year" on the wall of her breeding barn where she tracked horses in heat, horses bred, and similar information. (Tr at 208.) However, she did not "keep those long term because the vet has all those records." (*Id.*) Plaintiff insured some horses when pregnant, traveling, or showing. (Tr at 278-279.) She insured Sahara Illusion for $65,000 from 2009 to 2011 because she was travelling internationally, which is high risk, and because it was a condition of the sale. (Tr at 279, 490; *see also* Exs 28, FF8.)

The evidence demonstrates that Plaintiff maintained some horse-related records and some of those records identified expenses on a per horse basis. However, the court finds no evidence that Plaintiff used any of her records to evaluate the profitability of her activity or to reduce her expenses. The court appreciates that a "horse-by-horse" tracking system is not strictly necessary in a breeding business without clients. However, without some sort of record for each horse, it is unclear how Plaintiff could evaluate how much she had spent on a particular horse as compared to its success or likely sale price. Plaintiff may have had a "gut knowledge" about each horse, but it was not a businesslike approach. This sub-factor weighs slightly against Plaintiff.

/ / /

(3)     Business plan

A business plan is a characteristic of a businesslike operation, but it is not required if the plan was evidenced by actions. *See Dodds*, 2013 WL 968241 at *5; *Betts*, 2010 WL 2990300 at *6. Hopp and Petford each testified that small breeding farms do not typically have written business plans, but they have strategies. (Tr at 41-42, 115.) Plaintiff did not have a written business plan for any of her businesses, but she had a "five-point business strategy" for Bonfire Arabians: (1) quality product, by breeding the best mares to the best stallions; (2) promotion, by marketing with trainers and agents; (3) sales, by valuing horses based on accomplishments and "perceived future worth" and by selling foals that are not show quality; (4) market analysis, by "aligning [herself] with the best farms in the industry and becoming known as a leader" and by monitoring trends; and (5) financial analysis, by becoming "a self-sustaining source of income." (Tr at 173-177.) The court finds Plaintiff's lack of a written business plan to be neutral. She did not use written business plans for any of her businesses, including her successful business EVPT. Her strategy for her horse breeding activity was a bit vague, but it demonstrated her focus on a particular market segment: high-end Arabian halter horses that win shows.

(4)     Commingling funds

Courts have taken differing views on the commingling of personal and activity funds. The court in *Dodds* found it was "not indicative of businesslike practices." 2013 WL 968241 at *6. By contrast, the court was not troubled by commingling where, "the horse activity expenses were posted to a separate ledger maintained solely for the horse operation" and horse activity receipts were deposited into a separate savings account. *Engdahl v. Comm'r*, 72 TC 659, 667 (1979).

/ / /

Stewart testified that businesses that commingle successfully, keep detailed books, perform regular reconciliations, and keep separate folders for personal and business receipts; Plaintiff did none of those things. (Tr at 1184-1185.) Plaintiff operated her horse activity out of her personal account and maintained a separate bank account for EVPT. However, upon closer scrutiny of Plaintiff's ledger, it is apparent that she commingled EVPT funds with her horse and personal funds, and vice versa. The court finds Plaintiff's commingling of her personal and horse expenses to be neutral. Setting aside problems with the accuracy of Plaintiff's ledger and overall record-keeping system, she attempted to separately track her horse activity via her ledger in roughly the same manner that she tracked EVPT and her personal expenses. The court cannot say that Plaintiff treated her horse activity more like a business or more like a hobby.

>    b.    Conducting the activity similar to comparable, profitable activities

In the context of horse breeding, courts have considered the number of breeding horses owned, attempted breedings, foals produced, and sales. *See Giles*, 2006 WL 237503 at *10 (over a 15 year period, one breeding horse produced two live foals and three dead foals, and the taxpayer made no breeding attempts for five consecutive years); *Metz*, 2015 WL 1285276 at *12 (taxpayers sold "dozens of horses" over six years and some for "six figures, even up to $250,000").

Horses typically live 25 to 30 years and are first bred between 3 and 5 years of age. (Tr at 550.) The horse gestation period is 344 days, about 11 months. (Tr at 26, 548.) Horses do not go to market until "the yearling age," about one year old. (Tr at 26-27.) As a rule of thumb, AI with shipped semen yields a 60 percent pregnancy rate and frozen semen yields a 40 percent rate. (Tr at 49.) Horses are typically bred three out of four years, not every year. (Tr at 543-544.) By industry standards, 65 percent of a band of brood mares is pregnant in a given year. (Tr at 544.)

Marchart testified that Plaintiff had 166 opportunities to breed between 1999 and 2014, with 76 recorded attempts, resulting in 41 pregnancies. (Tr at 552-554.) 25 percent of Plaintiff's mare band was pregnant at any given time and 54 percent of her attempted breedings resulted in a pregnant mare. (Tr at 547-548, 584.) Plaintiff testified that it is too expensive to breed *all* of her mares every year; instead, she might breed three out of eight mares. (Tr at 426.) Plaintiff testified that her decisions about breeding pairings varied greatly: she might

> "buy breedings to a two-year-old or to a yearling that everyone's fired up about and never use them or wait until I have an appropriate mare. Or I may own two breedings to a national champion and find that I want to breed a third mare to him. So I'll buy another one immediately and use it immediately."

(Tr at 428-429.) There is also a timing aspect to breeding: foals born late in the year must compete with "same-age" horses that are actually three or four months older. (Tr at 1305.)

Hopp testified that "[y]ou don't sell the goose that lays the golden eggs." (Tr at 34.) "[G]enerally, you keep those production mares because they're the ones that are going to give you the best babies to be able to market." (Tr at 71.) Marchart testified that the mare that produced Gabriel is the closest to a "golden goose" because $150,000 "is a remarkable price point for a horse." (Tr at 582-583.) Plaintiff sold that mare, Angel Ize, in 2016. (Tr at 583, 630-631.) Plaintiff's inventory reveals that she successfully bred Angel Ize in 2010 to Gabriel's father, Eden, producing the filly Pucker in 2011 that was ultimately put down in 2013 due to a "joint disease." (Ex 6 at 10-17.) Plaintiff attempted (unsuccessfully) to breed Angel Ize in 2011, 2012, 2013, and 2014, with a scheduled breeding in 2015. (*Id.* at 6-19.)

The court finds that Plaintiff was actively engaged in breeding and selling horses every year. Although Plaintiff could have produced more foals, she adequately explained her thought process in selecting which and how many mares to breed. Plaintiff's pregnancy success rate is close to the "rule of thumb" industry standard for shipped semen: 54 percent as compared to 60

percent. Plaintiff's decision to sell the "golden goose" Angel Ize appears reasonable in light of her subsequent, unsuccessful attempts to breed Angel Ize over at least four years. Ultimately, the court cannot say whether Plaintiff conducted her breeding activity similar to a successful one because no such program was identified. Marchart testified that equine professionals do not, typically, own only a band of brood mares because it is not profitable. (Tr at 537-538.) She had "never seen anybody hold just a band of mares without having other avenues" to generate revenue, citing Hopp and Petford as examples.[23] (Tr at 543, 580-581.) This sub-factor is neutral.

> c. Changing operating procedures, adopting new techniques, or abandoning unprofitable methods to improve profitability

"Perhaps the most important indication of whether an activity is being performed in a businesslike manner is whether the taxpayer implements methods for controlling losses, including efforts to reduce expenses and generate income." *Dodds*, 2013 WL 968241 at *6. This may include purchasing a ranch to reduce boarding expenses, disposing of unsatisfactory horses, breeding mares to champion stallions, moving the operation to a better market, and traveling abroad to horse shows. *See Engdahl*, 72 TC at 667; *Metz*, 2015 WL 1285276 at *14.

Hopp testified that, around 2008, tastes in Arabian horses changed from what had been popular in the 1980s, 1990s, and into the 2000s. (Tr at 26.) Plaintiff responded to that change by "evaluat[ing] her herd" and determining which horses were assets and which were hindrances. (Tr at 27-28.) Plaintiff "got rid of" three "older style mares" in 2007[24] and sought to use "more popular stallions." (Tr at 28, 67-68.) Plaintiff testified that her strategy for recouping losses was

---

[23] Stan Keeter, one of Plaintiff's witnesses during the audit, ran a successful breeding operation that also offered stud services, and performed training and showing. (Tr at 906-907; *see also* Ex B.)

[24] According to her inventory, Plaintiff sold the filly of Crabby for $8,000; Lady Auria for $20,000; and Leggs for $8,000. (Ex 6 at 8-9.)

to "invest in better horses that are more attractive to elite buyers." (Tr at 437.) Her first "new style" horse was Exquisite Dream, aka Squeezy, purchased in 2004, and she began purchasing breedings to "very type-ey" horses in 2007 or 2008.[25] (Tr at 482-483.)

Hopp testified that the 2008 recession created a "significant downturn" in the sale of Arabian horses, likely because people had less "expendable cash." (Tr at 25.) Plaintiff observed the lack of "blue collar buyers" in market in 2008. (Tr at 270.) Petford testified that some breeders looked to Saudi Arabia, Kuwait, and eventually Europe as better markets, while others held off breeding.[26] (Tr at 100.) Plaintiff testified that she "was pretty conservative" in 2009; she bought one well-known mare that had already produced a foal that sold.[27] (Tr at 187.)

Stewart testified that Plaintiff could have leased out stall spaces for additional revenue, noting her observations of local market demand and pricing based on personal experience leasing spaces and professional experience preparing books for a farm. (Tr at 1156-1157, 1186-1188.)

Plaintiff identified three ways that she changed procedures or adopted new techniques: (1) using AI when it was permitted by the breed association; (2) selling "older style" mares and breeding her newer style mare; and (3) buying only one, well-known horse in 2009. Plaintiff also disposed of the most horses in 2009 out of any year, perhaps to reduce her expenses.

---

[25] Plaintiff purchased Squeezy in 2004 for an undisclosed price. (Ex 6 at 5.) Squeezy foaled the filly Scarlet Dream in 2004, the filly Martini in 2005, the colt Saxon in 2007, and the colt Magnum Quest in 2008. (*Id.* at 5-11.) Plaintiff sold Squeezy along with Chocolate Lily in 2009 for a total price of $87,500. (*Id.* at 13.) Plaintiff reported receiving only $61,264, of which she used $60,000 to buy Sahara Illusion. (*Id.*) Plaintiff attempted to breed Scarlet Dream in 2008, but the foal was absorbed, and she sold Scarlet Dream in a package of four horses for $12,000. (*Id.* at 10-11.) Plaintiff sold Martini for $30,000 in 2008. (*Id.* at 10.) Her inventory contains no further references to Saxon and Magnum Quest, so it is unclear what happened to them. (*See generally* Ex 6.)

[26] Hopp testified that Arabian Expressions marketed Gabriel and he "sold to Brazil where he went on to be twice Brazilian national champion." (Tr at 29.) Arabian Expressions marketed Night Vision BFA, a yearling filly, to Saudi Arabia where she competed at Saudi Nationals and was top five. (Tr at 29.) According to Plaintiff's inventory, Night Vision was foaled in 2010 and sold in the same year for $5,000. (Ex 6 at 14.)

[27] Plaintiff's inventory states that she purchased Sahara Illusion for $60,000, using proceeds from her sale of Chocolate Lily and Squeezy. (Ex 6 at 13.)

However, Plaintiff offered no evidence that she made any efforts to reduce her most significant expenses: veterinary and training.[28] Her training expenses were due, in part, to her poor market location in Creswell. Plaintiff described the exodus of horse training farms from Oregon between 2000 and 2007, which caused her to spend more money to send horses to Scottsdale for training. Plaintiff did not move her horse breeding operation to a better location or hire a trainer, and provided no evidence that she considered other ways to reduce those costs. Plaintiff made two attempts in the 1990s to add income streams to her activity, but never revisited her options despite losing significant sums. This factor weighs slightly against Plaintiff.

d.     Advertising

A businesslike operation includes "a consistent and concentrated advertising program." *Bronson*, 2012 WL 129803 at *5; *see also Metz*, 2015 WL 1285276 at *11 (the taxpayer's advertising included "professional-quality presentation folder[s]" with business cards, stallion cards, and articles from trade journals, advertisements in trade journals, professional videos, and a website). Failure to advertise may indicate the activity is not engaged in for profit. *See Price*, 2014 WL 7156457 at *21 (finding the taxpayers' "minimal advertising expenses" of $1,120 in 2009 and none in 2010 and 2011 did "not evince a profit objective"). Showing horses is one recognized method of advertising, but may not be sufficient in light of limited sales. *Compare Giles*, 2006 WL 237503 at *9 (noting that taxpayers "sold only one horse from 1988 through 2003") *with Engdahl*, 72 TC at 667 (noting the taxpayers showed their horses and advertised "in horse show programs, newspapers, and a horsemen's magazine, and by word of mouth").

Plaintiff did not maintain a website for Bonfire Arabians, but Arabian Expressions advertised her horses on its website. (Tr at 276-277.) Plaintiff estimated that she spent about

_____

[28] Training, Plaintiff's second biggest expense after veterinary, surpassed veterinary in 2009 and 2010.

$2,000 per year on advertising, not including training fees. (Tr at 277.) Plaintiff's primary method of advertising her horses, at least to national and international markets, was through trainers and shows. That is a recognized method of advertising Arabian halter horses and resulted in the sale of Gabriel for $150,000 and other horses at lesser price points. This factor is neutral.

### 2. *The expertise of Plaintiff of her advisors*

"Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices." Treas Reg § 1.183-2(b)(2). "The main inquiry is whether petitioner received advice from the experts as to the accepted principles and economics of profitably running a business and not merely the general advice that a horse enthusiast would seek in training and showing horses as a hobby." *Betts*, 2010 WL 2990300 at *8. "[K]nowledge of the activity itself apart from its economics is not enough to clear the hurdle: A taxpayer must demonstrate expertise and attempts to improve results in a money-losing business." *Metz*, 2015 WL 1285276 at *16. That said, consultation with persons who are "knowledgeable about horse breeding," including professional breeders, trainers, veterinarians, advisors, and others in the industry supports a profit motive. *Dodds*, 2013 WL 968241 at *6; *Engdahl*, 72 TC at 668; *Metz*, 2015 WL 1285276 at *15. A taxpayer's service on boards of breed associations and study of "horse bloodlines and pedigrees" may demonstrate the taxpayer's expertise. *Metz*, 2015 WL 1285276 at *14-15.

Plaintiff began her breeding activity with prior experience and knowledge gained through Feola Farms. Plaintiff also sought advice from trainers, judges, and other horse business owners.

(Tr at 168.) Frequent topics included industry trends, potential buyers, and offers. (Tr at 413, 483-484.) Plaintiff and Petford talked "virtually daily" until 2002 and less frequently from 2002 to 2011, discussing veterinary care, feed, managing her operation without a trainer, and the industry "collapse" in 1986. (Tr at 98-99, 120-124.) Plaintiff received estimates of the value of her horses from Petford or David Boggs (Boggs), but retained no documentation. (Tr at 415.) Plaintiff worked with Boggs even though he was sanctioned by the breed association, explaining she will "work with a trainer who gets [her] horses sold, bottom line." (Tr at 416-419, 568-569.) Plaintiff attended foaling clinics offered by her veterinarian. (Tr at 1314.) Plaintiff received specific advice on horses to buy, but paid a sales commission in each case. (Tr at 104, 185-186.) Hopp advised Plaintiff on selecting stallions and keeping or selling foals. (Tr at 50-51.) Plaintiff received some "obvious" financial advice from friends. (Tr at 1301-1302, 1310-1311.)

Plaintiff's own experience and knowledge of horse breeding weighs in her favor. Much of Plaintiff's consultation with industry experts concerned industry trends and recommendations on buying, selling, or breeding specific horses. That is distinct from financial advice on turning a profit from her activity. Many of the experts with whom Plaintiff consulted were compensated by Plaintiff for services: trainers received fees and agents received sales commissions. It is unlikely that a trainer, for instance, would recommend Plaintiff reduce her training expenses, even if it were in her best interest. Hopp testified that she never personally recommended anyone get out of the Arabian horse industry because "we don't have an Arabian industry unless we have breeders. * * * they're key to our business." (Tr at 82.) Even though Plaintiff received expert advice on quality horses and breeding pairs, there is no evidence she received expert advice on improving the profitability of her horse activity. This factor weighs slightly against Plaintiff.

3.      *The time and effort expended by Plaintiff in carrying on the activity*

"The fact that the taxpayer devotes much of [her] personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit.  A taxpayer's withdrawal from another occupation to devote most of [her] energies to the activity may also be evidence that the activity is engaged in for profit."

Treas Reg § 1.183-2(b)(3).  In the context of horse breeding, courts have found in favor of the taxpayer on this factor where the taxpayer spent 30 to 40 hours per week feeding and walking the horses, mucking stalls, and maintaining horse facilities.  *See, e.g., Dodds*, 2013 WL 968241 at *7; *Engdahl*, 72 TC 670-671; *but see Betts*, 2010 WL 2990300 at *9 (finding this factor neutral where taxpayer spent 40 hours per week performing similar activities, but also riding, competing, and socializing with her "circle of friends in the horse industry").

During the first five years, Plaintiff spent about 20 to 25 hours per week on her breeding activity and her children helped with farm chores.  (Tr at 167, 170.)  In 2010, Plaintiff spent about 15 hours per week on her breeding operation, not counting phone calls, lunches, and research.  (Tr at 420.)  She employed a stall cleaner in 2010.  (Tr at 421.)  Plaintiff continued to attend horse shows to network, but "with reducing frequency" because she was busy with work and children.  (Tr at 211-214.)  Plaintiff does not ride horses.  (Tr at 112, 194.)  Plaintiff worked 28 to 32 hours per week over four days at EVPT.  (*See* Tr at 214.)  The court finds this factor is neutral.  Plaintiff did not spend significant time on her horse activity or withdraw from EVPT. However, she did not ride horses or spend considerable time at horse shows.

4.      *The expectation that assets used in the activity may appreciate in value*

"The term profit encompasses appreciation in the value of assets, such as land, used in the activity.  Treas Reg § 1.183-2(b)(4).  Assets include horses that may appreciate in value. *See*

///

*Betts*, 2010 WL 2990300 at *10. In *Dodds*, the court found this factor neutral even though taxpayer

> "credibly testified that he expected his horses would appreciate because of his successful breeding program and that he believed he could eventually produce a 'golden cross' Morgan horse capable of garnering stud fees exceeding $10,000 and a sale price exceeding $100,000[,] * * * The appreciation of [taxpayer's] horse breeding assets does not begin to approach the amount of losses [taxpayer] has reported since the beginning of his horse activity."

2013 WL 968241 at *7. Holding land may, in some cases, be included with the activity of raising the horses. *See* Treas Reg § 1.183-1(d)[29]; *see Metz*, 2015 WL 1285276 at *17-18 (including land as part of the horse activity because taxpayers purchased properties with the intent to move their farming operation there); *see Rozzano v. Comm'r*, 94 TCM (CCH) 29 (2007), 2007 WL 1933000 at *1, *7-8 (US Tax Ct) (declining to consider the appreciation of taxpayers' land as a single activity with their horse boarding activity because they purchased the land initially for a family home).

Plaintiff's assets are her horses and potentially her land with horse-related improvements. She referenced horse appraisals, but did not provide them to the court or to Defendant. (Tr at 415, 1006-1008, 1309.) Neither Stewart nor Marchart could determine the value of Plaintiff's horses due to insufficient records. (Tr at 560, 584-585, 915-917.) With respect to her real property, Plaintiff purchased it with Craig before they started any horse activities, presumably for their family home, suggesting that her holding of that property is distinct from her horse

---

[29] "Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land)." Treas Reg § 1.183-1(d).

breeding activity. They built the barn and arena specifically for use by Feola Farms, but the court received no evidence of their value. (*See* Tr at 166.) This factor weighs slightly against Plaintiff.

5.       *The success of Plaintiff in carrying on other similar or dissimilar activities*

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that [she] is engaged in the present activity for profit, even though the activity is presently unprofitable." Treas Reg § 1.183-2(b)(5). "Business acumen and [taxpayer's] ability to develop and improve a business counts for this factor." *Metz,* 2015 WL 1285276 at \*19; *but see Dodds*, 2013 WL 968241 at \*7 (working as an accountant was "not sufficiently similar to operating a horse breeding activity to indicate that he could do so successfully"). Courts consider whether taxpayer conducts the unprofitable activity in the same manner as the profitable activity. *See Betts*, 2010 WL 2990300 at \*11; *Giles*, 2005 WL 375462 at \*16.

EVPT was and is profitable. Feola Farms made money, but Plaintiff did not recall specific amounts. Nooks & Grannies was not profitable. Plaintiff registered both EVPT and Nooks & Grannies with the Secretary of State, but not Bonfire Arabians. (Tr at 267.) No evidence was provided on whether Feola Farms was registered with the Secretary of State.

Plaintiff's successful operation of Feola Farms – a horse business involving training, showing, and breeding – weighs in her favor, particularly due to her responsibility for the more business-like aspects such as completing registrations and show entries; purchasing; and managing client relationships. Plaintiff performs some of those tasks for Bonfire Arabians, although she pays professionals to train, show, and market her horses. Through Feola Farms, Plaintiff gained knowledge of and contacts in the Arabian horse industry. Plaintiff's success

operating EVPT demonstrates her business acumen, but does not otherwise weigh in her favor due to significant differences between EVPT and Bonfire Arabians. Plaintiff used staff and a computerized program to manage appointments, billings, files, and records for EVPT, but not to operate Bonfire Arabians. (Tr at 433-435.) Overall, this factor weighs in favor of Plaintiff.

6. *Plaintiff's history of income or losses with respect to the activity*

"A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit."

Treas Reg § 1.183-2(b)(6). "[T]he best objective indicator that horse-breeding was a hobby, not a business, was [taxpayers'] high tolerance for loss." *Estate of Stuller v. U.S.*, 811 F3d 890, 897 (7th Cir 2016). Courts have repeatedly recognized startup periods of 5 to 10 years for horse breeding. *See Engdahl*, 72 TC 659 at 669; *McKeever v. Comm'r*, 80 TCM (CCH) 358 (2000), 2000 WL 1297710 at *16 (US Tax Ct); *Dodge v. Comm'r*, 75 TCM (CCH) 1914 (1989), 1989 WL 88175 at *7 (US Tax Ct). However, large cumulative losses over many years that could not possibly be recouped by any future profit indicate the taxpayer did not expect to make a profit. *See Golanty v. Comm'r*, 72 TC 411, 428 (1979); *Dodds*, 2013 WL 968241 at *8; *but see Metz*, 2015 WL 1285276 at *20 (looking at profit potential for "the current year onward" rather than "overall profit over the lifetime of the activity").

"If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit." Treas Reg § 1.183-2(b)(6). In some cases, courts have found changing tastes and market downturns to constitute "unforeseen events beyond the

control." *See Engdahl*, 72 TC at 669; *Metz*, 2015 WL 1285276 at *19. However, other courts have attributed those events to the speculative nature of horse breeding rather than unforeseen circumstances. *See Dodds*, 2013 WL 968241 at *8; *Giles*, 2005 WL 375462 at *17.

Plaintiff lost money on her horse breeding every year for which records were available: 1999 through 2013. Rather than decreasing at the end of her startup period, Plaintiff's losses increased. Plaintiff's losses ranged from $8,752 to $33,862 between 1999 and 2005. They increased to $77,371 in 2006; $44,060 in 2007; $152,987 in 2008; $163,892 in 2009; and $99,925 in 2010. Plaintiff's losses remained over $100,000 in 2011 through 2013. Those losses, especially after the startup phase, do not evince a business emerging from its startup phase.

Plaintiff attributes her losses to changes in taste and the recession of 2008. Marchart testified that it is not uncommon for breed preferences to change and Plaintiff testified that horse sales are driven largely by taste and speculation on future worth. (Tr at 175, 574-575.) Thus, it is hard to say that a change in tastes was "unforeseen." The court agrees that the recession in 2008 constituted an "unforeseen or fortuitous circumstance." The trouble here is that the court finds no link between Plaintiff's sales and the recession. Based on her inventory, 2009 was Plaintiff's best year in number of horses sold and total gross sales, and 2010 was her second best year in total gross sales. Despite her improved sales, Plaintiff's expenses – especially training, showing, and veterinary care – increased significantly, more than offsetting her income.

Plaintiff closed Nooks & Grannies after one year of losing money and testified that she would have made changes to EVPT if it had incurred losses like her horse breeding activity. Plaintiff's tolerance for losses from her horse breeding activity and her record of increasing losses over time, especially after the startup phase, weighs against her.

/ / /

7.      *The amount of occasional profits, if any, which are earned*

"The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent." Treas Reg § 1.183-2(b)(7). An adequately-supported belief that taxpayer could sell a horse for a large profit may indicate a profit motive. *Giles*, 2005 WL 375462 at *17; *see also Metz*, 2015 WL 1285276 at *21 (horse breeding is speculative and requires a "long time frame" to develop a "multigenerational-breeding program" with a slim potential for multi-million dollar fees).

Plaintiff has never achieved a profit from her horse breeding activity, but has "never doubted" that it "will ultimately be profitable." (Tr at 178.) Her plan to achieve a profit is to "[i]nvest in better horses that are more attractive to elite buyers." (Tr at 437.) Plaintiff hopes that a change in the market will help, noting a recent auction "that brought over $1.9 million into our industry." (*Id.*) Hopp saw "an absolute upturn" in the past six months and described two "very successful auctions held this year" (2017). (Tr at 29-30.) Hopp thinks Plaintiff has a "distinct chance of profitability" based on the improved market. (Tr at 73.) However, Stewart noted that even the occasional sale of $150,000 would not allow Plaintiff to recoup her losses. (Tr at 933.)

Even though Plaintiff achieved one significant sale price of $150,000, that sale was not sufficient to generate a profit due to Plaintiff's significant expenses. In 2010, Plaintiff spent a reported $166,925 to achieve revenue of $67,000. (*See* Ex X.) Similarly, in 2009, she reported spending $213,429 to achieve revenue of $49,537. (*See id.*) The evidence does not support a finding that a substantial profit in even one year would offset her expenses. This factor weighs against Plaintiff.

8. *Plaintiff's financial status*

"The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved."

Treas Reg § 1.183-2(b)(8). This court has found income of $272,000 in 2009 and $557,000 in 2010 to be substantial. *Withnell v. Dept. of Rev.*, TC-MD 130392C, WL 1357044 at *10 (Or Tax M Div Apr 7, 2014); *but see Ostrom v. Dept. of Rev.*, TC-MD 120773N, WL 2623740 at * 7 (Or Tax M Div June 7, 2013) (income from $100,000 to $125,000 during the 2008 through 2010 tax years not substantial). Where horse-related losses were "substantial" in comparison to income, the court found the factor to be neutral. *McKeever*, 2000 WL 1297710 at *18 (comparing wage income of $141,724, $148,169, and $171,379 with horse activity losses of $55,843, $70,598, and $64,886). "As long as tax rates are less than 100 percent, there is no 'benefit' in losing money." *Engdahl*, 72 TC at 670.

Without her farm losses, Plaintiff's reported income was $492,266 in 2008; $357,153 in 2009; and $282,970 in 2010. (*See* Exs OO at 1; NN at 1; 1 at 5.) Plaintiff's income from EVPT and other sources was adequate to offset her farm losses. (Tr at 885.) Stewart observed that Plaintiff's farm expenses increased at the same time that her other income increased. (Tr at 934-939; *see also* Exs X, OO at 11, PP at 12 (business income increased from about $175,000 in 2007 to $494,700 in 2008, whereas farm losses increased from $44,060 to $152,987).) Plaintiff testified that she did not try to shelter her increased income by generating more write-offs in 2009 and 2010. (Tr at 191-192.) Stewart acknowledged it was possible that Plaintiff was using her increased income to invest more in her struggling horse activity. (Tr at 1163-1165.)

/ / /

Plaintiff's income in 2010 and several preceding years may fairly be called "substantial." Without that income, she could not have operated her horse activity and sustained years of losses. Plaintiff's motivation for spending more on her horse activity when her income increased in 2008 is subject to various possible interpretations, but the court is persuaded by Plaintiff's testimony that she was not intentionally generating write-offs. As in *McKeever*, the court finds Plaintiff's farm losses were substantial compared to her income, making this factor neutral.

9.      *Any elements of personal pleasure or recreation*

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Treas Reg § 1.183-2(b)(9). However, even if taxpayers enjoy their work, "suffering has never been made a prerequisite to deductibility." *Metz*, 2015 WL 1285276 at *22 (citation and internal quotation marks omitted).

Plaintiff testified that she is "a scientist" and "love[s] considering which genetic phenotypes and genotypes will mix." (Tr at 193.) She enjoys researching pedigrees in the same way that she enjoys learning "a new protocol for a total hip replacement treatment." (Tr at 1303.) "It might be a new avenue for me to work" but "I don't know if I'd call it pleasure. The pleasure is seeing the result of the work." (*Id.*) Plaintiff's other "biggest joy comes from having a mare that delivers successfully [because] [i]t cuts down on vet bills, cuts down on problems. Everybody's happy." (Tr at 193-194.) Plaintiff does not ride horses and has never hesitated to sell or give away a horse if it made sense economically. (Tr at 194, 1304.) Hopp never heard Plaintiff talk about "great trail rides" or "snuggling with [her] horses," only business. (Tr at 36.)

Stewart concluded that Plaintiff's primary motive for engaging in Bonfire Arabians was personal. (Tr at 1125-1127; Ex A at 10.) Stewart noted Plaintiff's comment during the written

objection meeting in response to a question about her role in the activity: "I dance with the Governor and Sheikhs and keep the money flowing." (Tr at 990-991; Ex B at 4.) Plaintiff testified that her comment was "a smart alec answer" because she was tired after a four-hour meeting. (Tr at 1290-1291.) Stewart noted that Plaintiff made the following comments in a profile of her in a coffee table book produced by Boggs:

> "He [a stallion] is an incredibly charismatic son of Pogrom and his babies that I have seen are pretty spectacular. So, my hope for the near future? A beautiful foal crop, a ribbon in the ring, and a wine rack full of Northwest vintage. * * * I look forward to many more exciting Nationals moments."

(Tr at 447, 1168-1169; Ex 7.) Stewart identified the following as additional evidence of Plaintiff's personal motives: failure to sell mares after failed breeding attempts; failure to sell off her horse-related assets after a certain amount of losses; and use of "emotional" terms rather than "cold, clinical terms" when discussing breeding. (Tr at 945-946, 993-994, 1174-1175.)

It is clear that Plaintiff derives some pleasure from her horse activity and feels pride when she produces a quality foal. The court is not persuaded that Plaintiff was attached to her horses as pets and finds that Plaintiff regularly sold or gave away horses over the years. The court understands Plaintiff's comment at the audit meeting was a joke and places no weight on it. Similarly, the court finds the coffee table book was a marketing piece and should be viewed through that lens. The language is similar to promotional material produced by Feola Farms, which was engaged in for profit. (*See* Ex 43.[30]) This factor is neutral.

/ / /

/ / /

---

[30] The materials include statements such as "At Feola Farms, we believe in what we do. We enjoy it. We wake up in the morning and look forward to it. We believe that the Arabian horse is the most beautiful, impressive, magnetic creature on earth * * *." (Ex 43 at 2.)

10. *Conclusion on Plaintiff's profit motive*

Despite four days of trial, the court ultimately found a number of factors neutral or only slightly against Plaintiff. Plaintiff often testified credibly and persuasively on her own behalf. However, some aspects of Plaintiff's testimony cast doubt on her credibility or, at a minimum, demonstrate her lack of diligence in recordkeeping. Specifically, her testimony that her ledger was reconciled monthly is not credible in light of the four accounts represented consecutively in the ledger; her underreporting of proceeds from the sale of Gabriel; her omission of horse dispositions from her inventory, including the sale of Absolute Magnum for $50,000 in 2004, and her underreporting of other horse sales, including Lady Auria for $50,000 vs. $20,000; and her failure to timely respond to a subpoena, resulting in the loss of six months of bank records. (*See* Tr at 816-818.)

Upon consideration, the court places the most weight on the first, fifth, and sixth factors, and places secondary weight on the second, fourth and seventh factors. Plaintiff's successful operation of Feola Farms and EVPT weighs most strongly in her favor. She gained significant experience in the Arabian horse industry through Feola Farms and ran the business aspects of the operation. Plaintiff continued some type of horse activity after her divorce to capitalize on her existing assets (a few mares and horse-related real property) as well as her industry connections and knowledge. If the court were evaluating Plaintiff's horse activity in 1999 or 2000, it might be easier to conclude she had profit motive. However, Plaintiff's subsequent years of losses undercut any profit motive she had at the outset. The court is not persuaded that Plaintiff's losses were due to unforeseen circumstances. Her attempts to change procedures or adopt new techniques were relatively insignificant and were not aimed at reducing her largest expenses. Even though Plaintiff's horse-related real property was an asset during the Feola Farms era,

Plaintiff realized her market location was a hindrance by the mid-2000s because she had to send horses to Scottsdale for training and boarding. She failed to address that problem and incurred significant training expenses. Additionally, Plaintiff failed to fully utilize her barn by boarding horses or breeding more foals. Plaintiff's perseverance despite years of losses and her failure to make any significant or effective changes to her activity lead to the conclusion that, by 2010, she lacked a profit motive entirely or was indifferent to whether she made a profit.

B.     *Substantiation*

Plaintiff claimed expenses totaling $166,925 on her 2010 Schedule F and revised that total to $129,288 following trial. (Ex 1 at 14; Ptf's Post-Trial Mem at 28.) The following expenses remain at issue following Defendant's audit adjustments and Plaintiff's concessions:

| Category | Schedule F | Revised Position | Allowed at Audit |
|---|---|---|---|
| Depreciation | $1,534 | | $0 |
| Feed | $17,243 | $13,794 | $8,712 |
| Insurance | $1,069 | $2,122[31] | $0 |
| Repairs & Maintenance | $35,632 | $22,547 | $4,935 |
| Supplies | $6,687 | | $0 |
| Utilities | $2,924 | | $0 |
| Veterinary, Breeding, & Medicine | $31,739 | | $17,527 |
| Garbage | $170 | | $0 |
| Office | $7,906 | | $0 |
| Telephone | $2,795 | | $0 |
| Training | $37,294 | | $27,322 |
| Farrier | $0 | | $150 |

(*See also* Tr at 963-973; Ex 4 at 11-14.[32])

Of the expenses remaining at issue, none except for depreciation on Plaintiff's hauling truck is subject to the strict substantiation requirements of IRC section 274(d). (*See* Tr at 232;

[31] Plaintiff's Schedule F deduction for insurance was for vehicles, but she also paid $2,122 for insurance on Sahara Illusion. (Tr at 490-491 (discussing exhibit FF8 that was not admitted); Ptf's Post-Tr Mem at 24-25.)

[32] Stewart moved Plaintiff's tax preparation expense of $1,320 to Schedule A, so the amount is not at issue only the allocation to Plaintiff's horse activity. (Tr at 971, Ex 4 at 13.)

*Hillenga v. Dept. of Rev.*, 21 OTR 396, 413 (2014), *rev'd on other grounds* 358 Or 178, 361 P3d 598 (2015).) Thus, if a claimed business expense is deductible, but Plaintiff is unable to substantiate it fully, the court may make an approximation of the allowable amount. *Cohan v. Comm'r*, 39 F2d 540, 543-44 (2nd Cir 1930). The estimate must have a reasonable evidentiary basis. *Vanicek v. Comm'r*, 85 TC 731, 743 (1985). Stewart disallowed Plaintiff's claimed expenses in whole or part due to lack of documentation, failure to support the allocation between business and personal use, or failure to support the business purpose.[33] (*See* Tr at 963-973; Ex 4 at 11-14.)

The court begins with a few general observations about Plaintiff's records. The court finds Plaintiff's ledger, which served as the basis for her Schedule F deductions, an unreliable source for estimating expenses due to its significant errors. For instance, Plaintiff recorded in her ledger $7,000 in vet and farrier expenses from Visa statements, but a review of her Visa statements revealed only $4,168 in vet and farrier expenses. (Tr at 453-463, 469; *see also* Exs FF3-FF11.) Instead, the court looks to invoices, receipts, cancelled checks, and bank statements to support allowable deductions. Even where Plaintiff provided invoices – training, boarding, and veterinary expenses – it is difficult to determine what amounts she paid in 2010 because Plaintiff did not pay her invoices in full and did not know if and when she paid them. (*See* Tr at 440-441, 468-469.) It was "not uncommon" for Plaintiff's training and boarding expenses to accrue until the horse was sold. (Tr at 477.) Stewart looks for "completion of the circle," that is, both a receipt or invoice *and* a bank statement or cancelled check. (Tr at 863-864.)

/ / /

---

[33] Even though the court concluded Plaintiff's horse breeding activity was a hobby rather than a business, the court continues to use the term "business" to differentiate between expenses associated with Plaintiff's horse activity that are deductible on her Schedule A and purely personal expenses that are not deductible.

Upon review, the court finds insufficient evidence to support Plaintiff's deductions for depreciation, utilities, garbage, or telephone. As noted above, depreciation for her vehicle is subject to the strict substantiation requirements of IRC section 274(d). With respect to her utilities, Plaintiff testified that she had separate meters for her barn and house, but the court received no statements of any kind for utilities, telephone, or garbage. (*See* Tr at 1295.)

The court finds no basis to increase Plaintiff's deductions for feed, training, or veterinary expenses beyond what Defendant allowed. Plaintiff's receipts and invoices for feed totaled just over $10,187. (*See* Tr at 232-241; Exs 26 at 1-2, Ex 51 (Wilco, Haley, Wagon Wheel).) Plaintiff estimated 15 to 20 percent of those expenses were not farm related. (Tr at 236, 240; *see e.g.* Ex 51 at 29.) That yields an amount close to what Defendant allowed, $8,712. Plaintiff's training invoices detail monthly charges ranging from about $2,000 to $4,000 per month, with most between $2,000 and $2,200. (*See* Ex 31.) She also spent $1,323 for boarding associated with shows and veterinary clinic breedings. (*See* Tr at 262; Ex 34.) Plaintiff's total annual training expenses are likely in the range of $24,000 to $30,000. Stewart allowed $27,322, which the court accepts as reasonable. The court's review of Plaintiff's veterinary records did not yield an amount greater than $17,527, allowed by Defendant. (*See* Exs 21-24.)

The court found Plaintiff incurred greater expenses for farrier, insurance, repairs and maintenance, office, and supplies than allowed by Defendant. The court allows farrier expenses totaling $915 (*see* Exs 25, 34 at 3, 7); an insurance expense of $2,122 (Tr at 490-491); repair and maintenance expenses totaling $10,010; (Tr at 243-252; Exs 33, 51 at 3, 7, 21, 41, 43); office expenses totaling $1,130 (Tr at 257-258, 263 (explaining horse videos and registration fees allocated to office); Exs 29, 30, 32); and supply expenses totaling $5,494 (Tr at 253-254 (explaining use of sawdust and purchase from John Sells); Ex 51 at 4).

### III. CONCLUSION

After careful consideration, the court concludes that Plaintiff did not operate her horse breeding activity with a profit objective in the 2010 tax year. Accordingly, Plaintiff's deductions for her horse breeding activity are allowed only to the extent of her gross income from that activity. The court further concludes that Plaintiff's 2010 tax year allowable deductions from her horse breeding activity should be increased by $14,586 beyond the amount previously allowed by Defendant. Now, therefore,

IT IS THE DECISION OF THIS COURT that, as agreed to by the parties, Plaintiff's gross income from her horse breeding activity in tax year 2010 was $96,702.

IT IS FURTHER DECIDED that, in the 2010 tax year, Plaintiff did not operate her horse breeding activity with a profit objective.

IT IS FURTHER DECIDED that Plaintiff's 2010 tax year allowable deductions from her horse breeding activity are increased by $14,586 beyond what Defendant previously allowed resulting in total deductions allowed for her horse breeding activity of $77,662.

Dated this ____ day of March 2018.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer and entered on March 27, 2018.*